689 A.2d 1365

ANN PRETTYMAN, PETITIONER–RESPONDENT, v. STATE OF NEW JERSEY, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 26, 1997—Decided March 11, 1997.

Before Judges SHEBELL, BAIME and P.G. LEVY.

*Valerie L. Egan* argued the cause for appellant (*Peter Verniero*, Attorney General of New Jersey, attorney; *Mary Jacobson*, Assistant Attorney General, of counsel; *Jeffrey Monaghan*, Deputy Attorney General, on the brief).

*Arthur H. Kravitz* argued the cause for respondent (*Stark & Stark, P.C.*, attorneys; *Mr. Kravitz*, on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This is an appeal from an order of the Division of Workers' Compensation directing respondent-appellant, State of New Jer-

sey ("State"), to pay medical benefits to petitioner-respondent, Ann Prettyman ("petitioner"). On September 8, 1995, petitioner filed a Claim Petition alleging she suffered a compensable injury in the nature of depression, high blood pressure and post traumatic stress disorder as the result of being falsely imprisoned and harassed by State Police detectives in the State House basement. She moved in the Division for temporary disability and medical benefits on or about September 15, 1995. In its Answer to the Claim Petition, filed on May 22, 1996, the State denied the alleged injury occurred out of and in the course of petitioner's employment.

Hearings on the motion were heard before the Honorable William L. Boyan, Judge of Compensation, on November 13, 1995, November 29, 1995 and December 4, 1995. The judge ordered the State to pay for petitioner to continue to see a psychiatrist, Michael J. Orlosky, M.D. An appropriate order was entered, and the judge denied the State's motion for a stay. The State filed its Notice of Appeal and moved for summary disposition and a stay pending appeal. On April 8, 1996, we denied the motion.

The parties stipulated that petitioner was an employee in the Office of the Attorney General on August 3, 1995. Her title was Principal Stock Clerk and her duties included the operation and maintenance of the photocopiers; stocking of three supply rooms; sorting and distribution of mail twice daily; inventory of office furniture; data entry; and organization of a key system for offices, cabinets and desks in the building. These keys were kept in a cabinet in the supply room where petitioner sits. It was her duty to distribute the keys to other employees at the direction of her supervisor. She worked in this capacity for fourteen years and was never charged with a crime or written up on disciplinary charges.

In May 1995, the receptionist for the Attorney General inquired of petitioner about obtaining a key for her desk because she did not have any place to lock her things. Thereafter, petitioner found a key to the receptionist's desk and gave it to her. Al-

though petitioner requested that the receptionist return the key before she was laid off in June, she did not do so. In June 1995, petitioner went to look for the key. Petitioner looked in the receptionist's desk for the key but did not find it. She did not remove anything from the desk.

Apparently, an investigation of the theft of an expensive bracelet from a secretary's desk in the Office of the Attorney General was under way and petitioner was videotaped searching through the desk. A bracelet had been found in the women's bathroom by an employee, who turned it in. A sign was posted that the owner of the bracelet could retrieve it at the receptionist's desk. However, when the owner came to retrieve the bracelet, it was found to be missing. A surveillance camera was installed on June 22, 1995, and on June 27, 1995, a Criminal Justice Investigator monitoring the video surveillance observed a woman going through the desk in question. After further investigation, it was determined that petitioner was the woman on the videotape.

On August 3, 1995, two plainclothes State Police detectives approached petitioner outside of her office in the supply room. According to petitioner, they asked her if she would help them with an investigation and accompany them to the State House. It was petitioner's impression that by "help" they meant photocopying or something similar. Petitioner's immediate superior, and the Director, allowed her to go with the detectives. Petitioner was taken in an unmarked trooper car to the State House and escorted into a basement office where she sat down at a conference table.

The detectives informed petitioner that their conversation was confidential and shouldn't be taken personally. They then asked her to sign a Miranda card, which she did. Petitioner testified that it was at this point that she became scared. One of the detectives began interrogating her and she began to cry. They asked her about jewelry that was in a receptionist's desk and told her that they had pictures of her going through that desk.

Petitioner testified that she told them she had gone into the desk drawer and that it was nothing unusual for her to do. She became so scared that she had forgotten all about looking for the key.

Petitioner testified that the detectives told her about the missing jewelry. She said she did not know what they were talking about, and the detectives yelled at her and insisted she was lying. She became very emotional, and was crying and nauseated. The detectives made her sit on a bench with handcuffs on it, although she was not handcuffed, and they took her picture while she was sitting there. In order to take her picture, they physically lifted her up by her arms to a standing position. They threatened her with an arrest warrant and told her that she could go to jail for five to seven years.

Petitioner was shown the video of her going through the desk. She told the detectives that it was normal for her to go in the drawer if she needed a rubber band, etc. At that point petitioner remembered searching for the key and she told the detectives about the incident. Petitioner requested to call her sister or her cousin, but this request was denied. When petitioner went to the bathroom she tried to regain her composure and calm down because she still felt nauseated. One of the detectives began banging on the door and yelling at her to come out and finally sent a woman to get her out of the bathroom. The detectives then returned petitioner to her office. She offered to take a lie detector test, but was told she had to wait two weeks. She was detained by the detectives for two and one-half hours.

Before interviewing petitioner, one of the two detectives had determined that her normal duties would take her to the eighth floor reception area, but not to look through reception area desks. However, his investigation did not reveal that petitioner was in charge of the keys for the Justice Complex. He checked petitioner's work schedule and found that she was working on June 15,

the day the bracelet was taken, and June 28 [1], the day that a woman was observed on videotape. Before petitioner was interviewed, the detective spoke to petitioner's supervisors, who told him that it was "okay" to interview petitioner.

The two detectives testified. According to one of them, he offered to give petitioner a lie detector test, and she agreed. He told her that he would schedule one and notify her. When petitioner requested to use the bathroom, he escorted her there, and only after she was in there for about twenty minutes did he send a secretary in to check on her. After another fifteen minutes, he knocked on the door and told petitioner that he was taking her back to work. He thanked her for her help, told her he would contact her regarding the lie detector test, and gave her his name and number so that she could call him if she thought of anything else. He admitted showing petitioner the criminal statute and explaining what could happen if she committed this crime and was convicted. He denied petitioner ever asked to call family members during the interview.

The detective did schedule a polygraph for August 25, 1995. On August 23, 1995, he went to the Justice Complex and saw petitioner in her supervisor's office. She refused to talk to him and would not take the polygraph test. He interviewed the former receptionist, who confirmed petitioner's story about the key. Petitioner is no longer a suspect in the theft of the bracelet.

The second detective, who was the supervisor, explained that during the course of the interview petitioner went from denying ever being at the desk to a reasonable explanation of why she was there. He claimed that after hearing this explanation, he believed her to be innocent. He admitted that he read petitioner sections of the criminal code, but claimed it was so she would realize it was a serious situation, since she seemed not to believe the detectives. He denied petitioner's picture was taken. He testified that the

---

[1] In his testimony, the detective refers to both dates, June 27 and 28, as the day petitioner was videotaped going through the desk.

bench where petitioner was sitting was the place where they take pictures of suspects and that this is very obvious to a person sitting there since the camera is already set up.

Petitioner went to the Affirmative Action Officer when she returned to the office and told her what had happened. She was very upset, crying and dizzy. Her supervisor took her to the nurse where petitioner remained until the end of the day. Petitioner's blood pressure was high. She still wasn't feeling well when she went home that night. She went to work the next day but she felt "funny ... like [she] was being set up." Petitioner went to a doctor, and she was given blood pressure medication and told to stay home for two weeks, which she did. She returned to work, but still felt strange. About two weeks later, she was asked to take a lie detector test, first by her supervisor and then by the detectives. She refused on the advice of counsel, but became so upset after this that she left work and went to the Helene Fuld Crisis Center, where she was put on medication. She returned to work the following day.

At the time of the hearing, petitioner had seen Dr. Orlosky only once. She complained about diarrhea and nightmares. Prior to the incident with the detectives, petitioner had received psychiatric treatment for about six months after her engagement was broken off. Petitioner feels that her duties have changed since the incident, and she feels as if some of her duties have been shifted to another worker. She now uses a form when distributing keys. Petitioner is upset because she has questions about the incident that no one will answer and because no one has ever apologized for wrongfully accusing her of the crime.

At the conclusion of the first hearing, petitioner's counsel requested that the judge order the State to provide psychiatric treatment to petitioner, "without prejudice as to the final outcome of [the] hearing." Counsel based this request, in part, on the report of Dr. Orlosky which stated that petitioner was "in urgent need of psychiatric care and management." Although counsel for petitioner indicated that he was relying on petitioner's testimony

and Dr. Orlosky's report as his prima facie case, the report of Dr. Orlosky does not appear to have been marked in evidence. The judge declined to issue the order at that time and scheduled a hearing for November 29, 1995. On that date, the two State Police detectives testified.

Although at the conclusion of the November 29, 1995 hearing counsel for the State indicated he did not expect to call any further witnesses, he reserved the right to speak with his client in that regard. At the start of the December 4, 1995 proceeding, the State proposed to call a woman who worked with petitioner to testify that petitioner is, by nature, a very excitable person. The State asserted only that the testimony would assist the court in making credibility determinations. The judge ruled that her testimony was not admissible as to petitioner's credibility.

The judge then found:

petitioner is entitled to treatment. The state police went to her place of employment. She was told only that they wanted help with an investigation at the place of employment. She went willingly. Then she was taken over to the state police office in the State House, and they treated her exactly like they regularly treat criminal suspects.

. . . .

[S]he used to act as a replacement when an associate was out sick or at lunch or on a break, and they had two receptionists at the desk. . . . . [S]o she had frequent access to that desk, had frequently performed her duties sitting at that desk in the past[.]

. . . .

In addition to that, the petitioner was trusted by superiors with custody of the keys and the office and all the desks in the place, including a key to the very desk in question, and she was given custody of those keys at a time when there was a key. I can state, with respect to the keys and she organized them and she was trusted to do that, and I think that's another set of facts that the state police were blissfully unaware of when they started focusing on her as a criminal suspect, and think that they had done a more adequate job they would have learned that before they ever talked to her and would not have treated her with such hostility.

The judge did not believe the two detectives' version of the episode. He found the petitioner to be a more credible witness and believed that the police had taken her picture, and did not tell her they believed her story before they brought her back to work.

He found the detectives subjected petitioner to an unnecessary amount of pressure.

The judge found that "her preexisting vulnerability" was not enough to warrant a finding of noncompensability, and stated:

> It doesn't make sense to me to say [petitioner's] reaction under those circumstances is so idiosyncratic, that it ought not to be compensable and if they want to have sympathy for the system and protect the system from financial loss, the way to protect the system from financial loss is to have a better quality by the detectives in this situation, and find out beforehand, that she used to sit at that desk. Find out beforehand that she was trusted with the keys. Not take her out of friendly surroundings and put her in hostile surroundings; not try to isolate her from friendly influence, have a little sensitivity for the guy that anyone could immediately see. Not take her picture without telling her in advance that he was going to set off a flash bulb in her face, and taking her back and not telling her she's in the clear. And frankly, I did not believe them when they got on the stand and said they told her she was in the clear.

He ordered that petitioner could continue treatment with Dr. Orlosky and also indicated that a subsequent hearing would be scheduled with respect to petitioner's progress. At no point during any of the hearings did the State allege that the injury was not one arising out of and in the course of petitioner's employment. Although the State denied that the injury occurred out of and in the course of petitioner's employment in its Answer to her Claim Petition, the answer was filed subsequent to the motion hearings and order under review.

■ Our review of a decision of the Division of Workers' Compensation is controlled by the standard set forth in *Close v. Kordulak Brothers,* 44 *N.J.* 589, 210 *A.*2d 753 (1965). There, the Supreme Court held that the findings of an administrative agency must be supported by " 'sufficient credible evidence presented in the record.' " *Id.* at 599, 210 *A.*2d 753 (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)). The Court explained that when reviewing an agency determination, "due regard [should be given] to the agency's expertise where such expertise is a pertinent factor." *Id.* at 599, 210 *A.*2d 753. Regard should also be given to the judge's "opportunity to hear and observe the witness[es]." *Mathesius v. Saint Barnabas Med. Ctr.,* 265 *N.J.Super.* 83, 94, 625 *A.*2d 567 (App.Div.), *certif. denied,* 134 *N.J.* 560,

636 *A*.2d 519 (1993). In reviewing the ultimate determination of the agency as contrasted with its fact findings, we may "not upset a determination by [an agency] in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies. . . ." *Campbell v. Dep't of Civil Service,* 39 *N.J.* 556, 562, 189 *A*.2d 712 (1963).

The State argues that petitioner's injury did not occur "out of and in the course of [her] employment" as required by *N.J.S.A.* 34:15–7, and therefore, she is not entitled to compensation. *N.J.S.A.* 34:15–7 states, in pertinent part:

When employer and employee shall by agreement, either express or implied, as hereinafter provided, accept the provisions of this article compensation for personal injuries to, or for the death of, such employee by accident *arising out of and in the course of employment* shall be made by the employer. . . .

[*N.J.S.A.* 34:15–7 (emphasis added).]

An occurrence will be considered an accident "if either the circumstance causing the injury *or* the result on the employee's person was unlooked for. . . ." *George v. Great Eastern Food Products, Inc.,* 44 *N.J.* 44, 47, 207 *A*.2d 161 (1965). To determine if an injury arose out of and in the course of employment, a decision as to whether a causal connection exists between the employment and the injury is required. *Verge v. County of Morris,* 272 *N.J.Super.* 118, 126, 639 *A*.2d 378 (App.Div.1994). The Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –142, is remedial legislation and should be liberally construed. *Jersey City v. Borst,* 90 *N.J.L.* 454, 456, 101 *A*. 1033 (Sup.Ct.1917).

We have recognized that there are "three categories of risk used in determining the connection between employment and injury." *Verge, supra,* 272 *N.J.Super.* at 126, 639 *A*.2d 378 (citing *Howard v. Harwood's Restaurant Co.,* 25 *N.J.* 72, 83, 135 *A*.2d 161 (1957)). These categories are used to decide whether an injury arose out of the employment as required by *N.J.S.A.* 34:15–7. *Id.* at 126–28, 639 *A*.2d 378. The first category, described as a " 'but for' test," questions whether it is more likely than not that the injury would have occurred in the workplace rather than somewhere else. *Id.* at 126, 639 *A*.2d 378. The second category of

risks are classified as "neutral risks" and are those risks that occur due to " 'uncontrollable circumstances which do not originate in the employment environment but which happen to befall the employee during the course of his employment.' " *Id.* at 127, 639 *A.*2d 378 (quoting *Howard, supra,* 25 *N.J.* at 84, 135 *A.*2d 161). The third category of risks are those which "do not bear a sufficient causative relationship to the employment" and are considered "personal to the claimant" or " 'idiopathic.' " *Ibid.* (citations omitted).

█ Applying the but for test, it is more likely than not that this injury would have occurred in the workplace. *Id.* at 126, 639 *A.*2d 378. Petitioner would not have been interviewed by the State Police had she not been videotaped. Further, "but for" petitioner's performance of work-related duties, i.e., maintaining the keys for the office, she would not have been videotaped. Therefore, we find that petitioner's injury arose out of her employment under *N.J.S.A.* 34:15–7.

The doctrine invoked by the State that "layoff decisions and notices related to terminations are common to all types of employment" and, therefore, are not peculiar to any kind of employment has no application here. *Cairns v. City of East Orange,* 267 *N.J.Super.* 395, 400–01, 631 *A.*2d 978 (App.Div.1993). It is not reasonable to conclude that being subjected to such a hostile interview by State Police detectives investigating a workplace theft is something that can be expected to occur in all places of employment. It was because petitioner was performing her duties as principal stock clerk that the incident occurred. Thus, petitioner suffered an accident and injury as a result of an investigation directly related to the lawful execution of her duties. *Ibid.*

The State also attempts to analogize this case to the New York decision in *Burriesci v. Gristede Brothers,* 72 *A.D.*2d 619, 420 *N.Y.S.*2d 794 (App.Div.1979). In that case, a worker was investigated concerning an alleged sexual harassment/assault claim against another employee and experienced psychological difficul-

ties following the investigation. *Id.* at 794. The court held that the investigation was not work-related. *Id.* at 795. However, here, unlike in *Burriesci, supra,* the incident leading up to the investigation was wholly related to petitioner's work. Petitioner was acting within the scope of her employment when she was searching through the desk, whereas the petitioner in *Burriesci, supra,* was clearly not acting within the scope of his employment when he allegedly made unwanted sexual advances toward a coworker. *Id.* at 795. Therefore, *Burriesci, supra,* is inapplicable.

The risk petitioner was exposed to cannot be said in these circumstances to fall into the category of neutral or idiopathic risks. As to neutral risks, this was not something uncontrollable and unrelated to petitioner's employment which just happened to occur when petitioner was at work. *Verge, supra,* 272 *N.J.Super.* at 127, 639 *A.*2d 378. Rather, this was directly related to petitioner's employment since she became a suspect while and because she was performing work-related duties.

As to idiopathic risks, we held, in *Verge, supra,* that if a petitioner's injury is to "be characterized as an 'idiopathic event,' it must be found to be one which was caused by 'a purely personal condition having no work connection whatsoever.'" 272 *N.J.Super.* at 128, 639 *A.*2d 378 (citation omitted). Here, petitioner would not have been placed in this situation had she not been looking for a key which she was responsible for and which was one of her duties as Principal Stock Clerk. Therefore, petitioner's injury did not arise from an idiopathic event unrelated to her employment.

In addition to proving an injury arose out of employment, a petitioner must establish that the injury arose during the course of employment. *N.J.S.A.* 34:15-7. "An accident arises in the course of employment when 'it occurs while the employee is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time.'" *Hammond v. The Great Atlan-*

*tic & Pacific Tea Co.,* 56 *N.J.* 7, 11, 264 *A.*2d 204 (1970)(quoting *Bryant Adm'x v. Fissell,* 84 *N.J.L.* 72, 77, 86 *A.* 458 (Sup.Ct. 1913)). The State does not dispute that petitioner was performing her duties as Principal Stock Clerk when she was searching through the desk in question. The State attempts on appeal to avoid compensation by separating petitioner's actions in looking through the desk and the interview of petitioner by the State Police. Nonetheless, since the interview would not have occurred but for the fact that petitioner was performing her duties when videotaped, these two events cannot be viewed as separate and distinct and, therefore, the "interview" arose out of and in the course of petitioner's employment. If the interview had taken place at the time petitioner was searching through the desk, we doubt the issue would even be raised. The fact that the police waited, for whatever reason, until August 3rd to question petitioner should not work against her.

The State also asserts that petitioner's psychiatric disability is not causally related to her employment, citing *Walck v. Johns–Manville Products Corp.,* 56 *N.J.* 533, 267 *A.*2d 508 (1970) and *Williams v. Western Electric Co.,* 178 *N.J.Super.* 571, 429 *A.*2d 1063 (App.Div.1981). However, these cases are factually distinguishable from this matter as the disability depicted in them was generally attributed to a stressful work environment rather than a specific event. *See Walck, supra,* 56 *N.J.* at 556–58, 267 *A.*2d 508; *Williams, supra,* 178 *N.J.Super.* at 584–89, 429 *A.*2d 1063; *see also Goyden v. State Judiciary,* 256 *N.J.Super.* 438, 607 *A.*2d 651 (App.Div.1991), *aff'd,* 128 *N.J.* 54, 607 *A.*2d 622 (1992). In this case, a specific traumatic event, petitioner's treatment at the hands of the State Police, was the cause of her psychiatric disability. Therefore, the cases relied on by the State do not support the contention that petitioner's disability is not related to her employment.

The State further urges that the judge improperly denied the State the opportunity to adequately present its case. The State at the final hearing attempted to present the testimony of petition-

er's supervisor that petitioner had been "a very emotional and somewhat excitable individual" prior to this incident, and that she might have "overreacted and exaggerated as to how the interview was conducted." The judge did not allow this testimony as he did not "think that is admissible on credibility."

■ Even assuming the judge's decision to disallow this testimony was error, the testimony of a lay person as to prior instances of petitioner's overreaction or exaggeration would not have added significantly to the defense. We perceive that the testimony would go more to predisposition than credibility. Since "New Jersey adheres to the proposition that the employer takes the employee as the employer finds the employee, with all of the pre-existing disease and infirmity that may exist," *Verge, supra,* 272 *N.J.Super.* at 125, 639 *A.*2d 378, we see no reversible error. Moreover, there was ample evidence from which the judge could decide whether petitioner was telling the truth or exaggerating. Both detectives testified as to their actions during the interview. Petitioner herself also testified, giving the judge a chance to assess her credibility firsthand. Finally, the judge had before him the report of a psychiatrist, Dr. Shaw, who described petitioner as having a tendency toward exaggeration and overreaction. We find no cause to reverse based on the judge's evidentiary ruling, or on his substantive determination that petitioner's reaction was not idiosyncratic. *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753.

The State next contends that the judge improperly relied on Dr. Orlosky's report, which it alleges was not admitted into evidence. The State contends that it "was never given the opportunity to decide whether the State would agree to submit the examining reports into evidence or insist on the right to cross examine Dr. Orlosky with Ms. Prettyman's counsel having the same right to cross examine Dr. Perry Shaw." The State, however, did not request the chance to cross-examine Dr. Orlosky or object when the judge relied on the report in making his decision. It was clear that petitioner relied on this report since counsel for petitioner supported the application for an interim order at the close of the

first hearing with Dr. Orlosky's findings from his report. Counsel for petitioner agreed with the judge that the petitioner's testimony and Dr. Orlosky's report was their "prima facie case." If the State had any objection or desired to cross-examine Dr. Orlosky, counsel should have made that clear either at that time or at the start of the next hearing.

It appears to have been an oversight that Dr. Orlosky's report was not admitted into evidence. Nevertheless, as this was not objected to at trial and it was clear the judge relied on Dr. Orlosky's report, we conclude that the failure to formally introduce it into evidence is not "clearly capable of producing an unjust result." *R.* 2:10–2.

The State's final contention is that the judge's fact findings were not supported by sufficient credible evidence in the record. The State essentially disagrees with the judge's decision to believe petitioner over the two detectives who testified. However, this is entirely within the discretion of the trial judge and this court must give deference to his ability to view the witnesses and assess their credibility. *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753.

The judge found that the detectives placed petitioner into a hostile environment, and then once they realized that she did not steal the bracelet, they simply took her back to work without telling her that she was no longer a suspect. The judge also found that the detectives did not adequately verify petitioner's work duties as they did not know she had a legitimate reason for being in the desk. We may not disturb the findings that the detectives were attempting to intimidate petitioner by talking to her alone and away from her work, by refusing to let her call anyone, by taking her picture and by generally treating her harshly. All of these findings are supported by petitioner's testimony, and merely because the judge believed petitioner over the two detectives does not mean that his findings are not supported by the evidence.

Finally, even if the detectives' actions were legitimate law enforcement techniques, the fact that their actions caused petitioner's psychiatric disability is sufficient for an award of benefits, where, as here, the occurrence which gave rise to petitioner's injury meets the definition of an accident arising out of and in the course of her employment. *N.J.S.A.* 34:15–7. Had she not been performing her duties in attempting to retrieve the key, she would not have been videotaped by the State Police and she would not have been interviewed as a suspect in the theft.

The award of temporary medical benefits is affirmed.