791 A.2d 1030

Nos. A–1961–00T3, A–2044–00T3.[1]

DIANA BRUNELL, PETITIONER–APPELLANT, v.
WILDWOOD CREST POLICE DEPARTMENT,
RESPONDENT–RESPONDENT.

SAMUEL STANGO, PETITIONER–APPELLANT, v.
LOWER TOWNSHIP POLICE DEPARTMENT,
RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued Telephonically (A–2044–00T3) January 10, 2002—Argued (A–
1961–00T3) January 16, 2002—Decided February 21, 2002.

---

[1] These appeals calendared back-to-back are consolidated on the court's motion for purposes of opinion only.

Before Judges KING, CUFF and WECKER.

*Christine DiMuzio,* argued the cause for appellant *Diana Brunell* (*Hoffman, DiMuzio & Hoffman,* attorneys, *Kenneth A. DiMuzio,* of counsel; *Ms. DiMuzio,* on the brief).

*Carmine J. Taglialatella* argued the cause for appellant *Samuel Stango* (*Press & Long,* attorneys; *Mr. Taglialatella* and *David K. Long,* on the brief).

*Michael S. Affanato* argued the cause for respondents Wildwood Crest Police Department and Lower Township Police Department (*Margolis Edelstein,* attorneys; *Mr. Affanato,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

These cases present the problem of when a workers' compensation claim for post-traumatic stress disorder, with alleged delayed onset (PTSD–DO), is barred by the two-year period of limitations in the Workers' Compensation Act. Petitioners contend they have two years to press these claims from the time the symptoms allegedly become manifest and a diagnosis is made, similar to an

occupational disease claim. The employers contend that these claims arise from accidents and must be asserted within two years of the stress-producing events. We conclude that the employers' contention is compelled by controlling precedent. Any change in the law in this respect must come from the Legislature or a reinterpretation or modification of current precedent by the Supreme Court.

I

Petitioner Samuel Stango is a veteran of the Lower Township Police Department in Cape May County. He was employed as a uniformed patrolman for about nine years. Late in the evening of February 18, 1994 petitioner and Patrolman David Douglass were on duty when they responded to a domestic violence call. Upon arrival, the officers split up as they approached the house. Petitioner approached the backyard. He heard gun shots, or a "pop" and a reply "pop." He ran to the front of the house and found his partner lying on the ground bleeding. Petitioner held his partner as he struggled for life but died.

Petitioner now claims to have had flashbacks of the events and is still "tormented" by the memory of watching his partner bleed from the mouth, ears, eyes and eventually to death. He had ongoing problems with anxiety from the time of the event. He awakened at night with panic feelings, anxiety and sweats. He had bad dreams and felt inadequate in his job performance.

On February 13, 2000 petitioner Stango was bringing balloons into his home for his daughter's birthday. One or two balloons "popped" while he was bringing them in the front door. Petitioner said he suddenly felt as though he was back at the time of the shooting incident in 1994. At this point, he realized he needed help. He began to speak with other officers who also had been in "bad situations." He located a Stress Unit on the Internet and was referred to a psychologist. On April 5, 2000 he also told a superior, Lt. Donahue of the Lower Township Police Department,

how he was feeling. He was relieved of duty and surrendered his weapon.

Dr. Lawrence Clinton, a board-certified psychologist, saw petitioner on May 3, 2000 and received the above-described history emanating from the episode in 1994. Petitioner told the psychologist this:

> He said that he was upset because he had ignored a lot of his post traumatic stress symptoms for almost six years, but they would come back to haunt him. This incident last year with the balloons just brought it back full force. He had a lot of fears that he may hurt someone or be killed on the job. He has a lot of anxiety concerning this and has developed some stomach trouble. He has problems making decisions.

Dr. Clinton concluded that petitioner Stango had "an ongoing, chronic post-traumatic stress disorder with anxiety secondary to a work-related incident when his partner was shot and Mr. Stango observed his death." Medication and therapy were recommended.

In April and June 2000 petitioner Stango filed two claim petitions—the first premised on the shooting episode in 1994 and the second on the "pop" of the birthday balloons in February 2000. Based on these undisputed facts the judge of compensation dismissed the claims as time-barred and not an occupational disease as to the 1994 claim, and not work-related as to the balloon "pop" in 2000.

At oral argument, counsel advised us that petitioner Stango has retired on a "traumatic event" accidental disability pension, *see* *N.J.S.A.* 43:16A–7, which requires a dollar-for-dollar reimbursement to the pension fund for any recovery in this workers' compensation action. *See Conklin v. City of East Orange,* 73 *N.J.* 198, 373 *A.*2d 996 (1977).

## II

Petitioner Diana Brunell was employed by the Borough of Wildwood Crest Police Department in Cape May County as a dispatcher. On June 2, 1995 she was on duty when an officer suffered a cardiac arrest caused by trauma during an altercation with a suspect. He died that night. As the dispatcher, petitioner

Brunell called for assistance at the scene, notified superiors and co-workers, and arranged for an officer to inform the widow.

In June 1999 petitioner began to have problems at work and disagreements with co-workers. In July of 1999 she was sent to see Dr. Richard Cohen, a psychologist retained by Wildwood Crest. She was suspended from work on August 2. On August 9 she returned to work. On August 10 after her shift she went to an appointment with Dr. Cohen. That afternoon Dr. Cohen contacted her employer advising she should not return to work and referred her to Dr. McInerney for a psychological examination. On August 20 Dr. Miley of Dr. McInerney's office reported this history and diagnosis:

> ... She reported that she attempted to gain as much information as possible at the time and to get help to the scene. She stated that at that time, symptoms of anxiety, depression, nightmares, irritability, fatigue, insomnia, and exaggerated startle response developed and became more tense over the months and years. She appears to also have mild feelings of guilt and loss of sense of control over what happened.
>
> Recently, she was seen by Dr. Richard Cohen, a psychologist on retainer to the Wildwood Crest Police Department. From there, she was referred to this office.
>
> It is my opinion that the symptoms that Ms. Brunell is experiencing [are] the direct results of the death of the police officer from the cardiac infarction while the client was on duty.
>
> It is my opinion that Ms. Brunell is suffering from the symptoms of Post Traumatic Stress Disorder. I recommend that she receive a course of antidepressant medication. I also recommend that she seek regular psychotherapy consisting of cognitive restructuring of the traumatic incident, systematic desensitization of her reactions to the incident and supportive psychotherapy to allow her to develop a more realistic framework in which to put this incident. It is also my [advice] that Ms. Brunell should have twelve to fifteen sessions of psychotherapy, bi-weekly. Following this, Ms. Brunell should be reassessed regarding her progress in therapy.

As of July 16, 2000 petitioner Brunell had not returned to work.

Wildwood Crest denied benefits. On January 6, 2000 petitioner Brunell filed a claim for workers' compensation benefits. Wildwood Crest moved to dismiss; the judge dismissed the claim for failure to file a timely petition.

## III

■ We conclude the judge of compensation properly applied the two-year "accident" period of limitations, *N.J.S.A.* 34:15–41 and *N.J.S.A.* 34:15–51, rather than the occupational disease statute of limitations, *N.J.S.A.* 34:15–34, to the petitioners' claims for post-traumatic stress disorder with alleged delayed onset (PTSD–DO). The question of "delayed onset" is one of degree in these cases. The DSM–IV–RT (4th ed.) § 509.81 at 468 (1994) published by the American Psychiatric Association describes PTSD "with delayed onset" as the onset of symptoms "at least six months after the stressor." "Symptoms usually begin within the first three months after trauma, although there may be a delay of months, or even years, before symptoms appear." *Id.* at 466.

Dr. Miley made a specific diagnosis of "delayed onset" in Dispatcher Brunell's case, although by history she developed symptoms shortly after the incident which grew worse over time. She claimed gradual onset of more severe symptoms. In Patrolman Stango's case, Dr. Clinton did not express a specific "delayed onset" diagnosis. His history disclosed "ongoing problems which persisted" since the shooting incident. These certainly are not cases where the actual onset was delayed for months or even years. *Ibid.*

The "accident" period of limitations in § 41 and § 51 provides that the petition for compensation must be filed within two years of the date of accident. *N.J.S.A.* 34:15–41 states:

> In case of personal injury or death all claims for compensation on account thereof shall be forever barred unless a petition is filed in duplicate with the secretary of the workmen's compensation bureau, as prescribed by section 34:15–51 of this title.

*N.J.S.A.* 34:15–51 states, in pertinent part:

> Every claimant for compensation under Article 2 of this chapter (§ 34:15–7 et seq.) shall, unless a settlement is effected or a petition filed under the provisions of 34:15–50 of this Title, file a petition in duplicate with the division in Trenton, within 2 years after the date on which the accident occurred....

In contrast, the occupational disease statute of limitations, *N.J.S.A.* 34:15–34, provides that a petition must be filed within two years of the date when the petitioner first knew of the disability

and its relation to the employment. *N.J.S.A.* 34:15–34 states in pertinent part:

> Notwithstanding the time limitation for the filing of claims for compensation as set forth in sections 34:15–41 and 34:15–51, or as set forth in any other section of this Title, there shall be no time limitation upon the filing of claims for compensation for compensable occupational disease, as hereinabove defined; provided, however, that where a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease except as herein provided shall be barred unless a petition is filed in duplicate with the secretary of the division in Trenton within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment. . . .

Petitioners claim that the judge erred in concluding that their PTSD–DO arose from an accident. They urge this court to conclude that their PTSD–DO is an occupational disease with the period of limitations expressed in *N.J.S.A.* 34:15–34 controlling, i.e., "two years after the date on which the claimant first knew the nature of the disability and its relation to the employment." An occupational disease is defined as "all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment." *N.J.S.A.* 34:15–31.

▮ The DSM–IV has these comments with respect to "Specific Cultural Features" of PTSD:

> Individuals who have recently emigrated from areas of considerable social unrest and civil conflict may have elevated rates of Post–traumatic Stress Disorder. Such individuals may be especially reluctant to divulge experiences of torture and trauma due to their vulnerable political immigrant status. Specific assessments of traumatic experiences and concomitant symptoms are needed for such individuals.
> [DSM–IV at 465.]

As to "Prevalence" of PTSD the DSM–IV states:

> Community-based studies reveal a lifetime prevalence for Post–traumatic Stress Disorder of approximately 8% of the adult population in the United States. Information is not currently available with regard to the general population prevalence in other countries. Studies of at-risk individuals (e.g., groups exposed to specific traumatic incidents) yield variable findings, with the highest rates (ranging between one-third and more than half of those exposed) found among survivors of rape, military combat and captivity, and ethnically or politically motivated internment and genocide.

[*Id.* at 466.]

We cannot conclude that PTSD is "characteristic of or peculiar to" police work, including dispatching. Workers in offices, factories, and many other places are exposed, as well, to acute and unpredictable stress in today's environment. Persons in other circumstances historically are more disposed to the syndrome than police officers and dispatchers.

Special statutory recognition for occupational hazards was provided by the Legislature in 1987 for police, fire and rescue workers suffering strokes or heart attacks when responding to an emergency, *N.J.S.A.* 34:15–7.3.[2] This type of legislative exception may be a solution to the tendency of PTSD in some cases to reveal delayed severity but of course, unlike the Legislature, we cannot create a special category for uniformed public safety workers claiming PTSD simply because of the emotional appeal of the cases before us.

The compensation judge understandably found PTSD, by its very name, "oxymoronic" because post-traumatic means after

---

[2] *N.J.S.A.* 34:15–7.3 states:

1. a. For any cardiovascular or cerebrovascular injury or death which occurs to an individual covered by subsection b. of this section while that individual is engaged in a response to an emergency, there shall be a rebuttable presumption that the injury or death is compensable under R.S. 34:15–1 et seq., if that injury or death occurs while the individual is responding, under orders from competent authority, to a law enforcement, public safety or medical emergency as defined in subsection c. of this section.

b. This section shall apply to:

(1) Any permanent or temporary member of a paid or part-paid fire or police department and force;

(2) Any member of a volunteer fire company;

(3) Any member of a volunteer first aid or rescue squad; and

(4) Any special, reserve, or auxiliary policeman doing volunteer duty.

c. As used in this section, "law enforcement, public safety or medical emergency" means any combination of circumstances requiring immediate action to prevent the loss of human life, the destruction of property, or the violation of the criminal laws of this State or its political subdivisions, and includes, but is not limited to, the suppression of a fire, a firemanic drill, the apprehension of a criminal, or medical and rescue service.

trauma, which implies an accident or an incident, while a stress disorder sounds more like a disease. We think that the compensation judge sensibly concluded that the legislature wanted to make it "very clear" it was not adopting, in the overall, the more flexible "discovery of injury" rule. *N.J.S.A.* 34:15–35 states in full:

**Provisions applicable to occupational diseases; claim for accident excluded**

All provisions of this article and article 3 of this title (§ 34:15–36 et seq.), applicable to claims for injury or death by accident, shall apply to injury or death by compensable occupational disease, except to the extent that they are inconsistent with the provisions contained in sections 34:15–30 to 34:15–34 [the occupational disease section] of this title. *The provisions in said sections 34:15–30 to 34:15–34 shall not apply to any claim for compensation for injury resulting from accident.* [Emphasis supplied.]

In support of her argument that PTSD–DO should be classified as an occupational disease as a matter of law, petitioner Brunell relies upon *Biasetti v. City of Stamford,* 250 *Conn.* 65, 735 *A.*2d 321 (1999), and *Means v. Baltimore County,* 344 *Md.* 661, 689 *A.*2d 1238 (1997). Although both the Connecticut Supreme Court and the Court of Appeals of Maryland have held that PTSD could be considered an occupational disease, neither court has held as a matter of law that PTSD is necessarily in all cases an occupational disease. Neither case involved delayed filing of claims. In *Biasetti* petitioner police officer sought disability benefits alleging that he suffered from post-traumatic stress disorder or combat fatigue syndrome as a result of a high-speed car chase and ensuing gun battle with a suspect. Although the Supreme Court of Connecticut held that under the facts presented, the petitioner's post-traumatic stress disorder was an occupational disease, it was held not compensable since it failed to satisfy the statutory definition of a personal injury. *Biasetti,* 735 *A.*2d at 323–24.

In *Means,* the petitioner paramedic sought benefits alleging that she suffered from PTSD–DO as a result of witnessing several especially gruesome accidents. Maryland's highest court addressed the issue of whether PTSD should be excluded from compensable occupational diseases. That court held PTSD may be considered an occupational disease under Maryland's Workers' Compensation Act since it "may be compatible with the general

character of occupational disease." *Means,* 689 *A.*2d at 1243. The court described an occupational disease as " 'some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach.' " *Ibid.* (*quoting Foble v. Knefely,* 176 *Md.* 474, 6 *A.*2d 48, 53 (1939)).

Although petitioner Brunell correctly states that the Maryland courts have found that PTSD may be considered an occupational disease, she overlooks the reality that the Maryland courts have also found PTSD can constitute an accidental injury. In *Belcher v. T. Rowe Price,* 329 *Md.* 709, 621 *A.*2d 872 (1993), petitioner secretary sought disability benefits alleging that she suffered PTSD after a three-ton beam crashed through the roof of her office and landed only five feet from her desk. The Maryland court held that the petitioner was entitled to compensation because her injuries resulted from an accidental personal injury. *Id.* at 890.

Our court also has held that PTSD is compensable under the "accident" provision when it arises from a single event. *Prettyman v. State,* 298 *N.J.Super.* 580, 689 *A.*2d 1365 (App.Div.1997). The petitioner in *Prettyman* filed a petition alleging PTSD as a result of an interrogation by State Police detectives. Although the main issue was whether the petitioner's injury arose out of the course of employment, we determined that "a specific traumatic event, petitioner's treatment at the hands of the State Police, was the cause of her psychiatric disability." *Id.* at 594, 689 *A.*2d 1365.

These cases suggest that when a claimant seeks compensation for PTSD, the claim must be considered in light of the specific triggering facts. The compensation judge here determined that the petitioners' PTSD–DO's were caused by a single traumatic event. In Brunell's case, the petition filed with the Division of Workers' Compensation alleged "that [p]etitioner sustained an injury by an accident arising out of and in, the course of [p]etitioner's employment with [r]espondent. . . ." The petition stated that "[p]etitioner suffered delayed onset of post-traumatic stress disor-

der from 6/2/95 death of officer." In Brunell's case, as in *Prettyman*, the petition references a single incident, not a series of incidents or traumas. Stango's claim petition alleged the injury arose from a "shooting incident" on February 18, 1994. The compensation judge correctly concluded that the petitioners' PTSD–DO's were "not the result of a process but an initiating event." There was no articulated claim, for example, that the insidious, stressful effect of day-to-day police work was the source of the disability.

The petitioners contend that the case law regarding accidental injuries is inapplicable to their claims since they were not the victims of an underlying accident. Petitioner Brunell argues that she did not suffer a personal injury until her PTSD was diagnosed on August 10, 1999. Petitioner Stango asserts his claim arose on May 3, 2000 upon Dr. Clinton's evaluation. Petitioners analogize to *Earl v. Johnson & Johnson*, 158 *N.J.* 155, 728 *A.*2d 820 (1999), in support of their position. In *Earl*, the claimant filed a petition alleging that her permanent pulmonary problems were caused by continuous exposure to irritants at her place of employment. The employer argued that the statute of limitations began to run when the claimant became aware of her breathing problems. The Court held that the claimant actually was not aware of the extent of her injury until pulmonary function tests were performed and *N.J.S.A.* 34:15–34's period of limitations did not begin to run until the date those tests were performed. The Court, adopting the reasoning of the Pennsylvania Supreme Court, stated "an occupational disease is distinguishable from an accident, because an accident 'rises from a definite event, the time and place of which can be fixed, while [an occupational disease] develops gradually over a long period of time.'" *Id.* at 164, 728 *A.*2d 820 (*quoting Ciabattoni v. Birdsboro Steel Foundry & Mach. Co.*, 386 *Pa.* 179, 125 *A.*2d 365, 368 (1956)).

In the Brunell case, petitioner filed a petition alleging PTSD–DO stemming from the June 2, 1995 incident. In his letter to Scibal Associates, Dr. Miley stated that petitioner's symptoms

began directly after the death of Officer Miglio. "She stated that at that time, symptoms of anxiety, depression, nightmares, irritability, fatigue, insomnia and exaggerated startle response developed and became more intense over the months and years. She appears to also have mild feelings of guilt and loss of sense of control over what happened." These historical facts show that petitioner Brunell was not suffering from a disease "of such an insidious nature that [it did] not become evident until years after exposure to the cause thereof." *Earl*, 158 *N.J.* at 163, 728 *A.*2d 820 (*quoting Panzino v. Continental Can Co.*, 71 *N.J.* 298, 301, 364 *A.*2d 1043 (1976)). The same is true in Patrolman Stango's case where symptoms historically persisted from the outset.

The compensation judge, in discussing the claims made by petitioners Brunell and Stango, accurately concluded "there were specific traumatic or upsetting events, and both petitioners knew they were upset on that day." In *Schwarz v. Federal Shipbuilding and Dry Dock Co.*, 16 *N.J.* 243, 108 *A.*2d 417 (1954), the Court discussed the applicability of *N.J.S.A.* 34:15–51 when the claimant was aware that he had suffered an injury, but was unaware of the extent of the injury until after the statute barred the claim. The Court stated that *N.J.S.A.* 34:15–51 requires that a petition shall be filed within two years of the date of the accident, and "we are asked to construe this to mean 'two years after the date the injury was discovered.' This we cannot do." *Id.* at 251, 108 *A.*2d 417. The Court concluded that *N.J.S.A.* 34:15–51 is an "accident" statute, not an "injury" statute. "Our courts have found no indication of a legislative purpose to suspend the running of the statute until the injury becomes manifest. It was so held in *Cristo v. Standard Oil Co.*, 98 *N.J.L.* 871, 121 *A.* 609 (E. & A.1923), and there has been no legislative action since to modify the statute as so construed." *Ibid.* The Court concluded by stating "such a change in the statute is a problem for the Legislature. . . ." *Ibid.See also Riccioni v. American Cyanamid Co.*, 26 *N.J.Super.* 1, 9, 96 *A.*2d 765 (App.Div.), *certif. denied,* 13 *N.J.* 289, 99 *A.*2d 450 (1953) ("We are sympathetic, but the judiciary is not at liberty in

matters of jurisdiction to subordinate the requirements of the law to the natural influences of sentiment and benevolence.").

In these cases before us, the compensation judge made the correct determination, i.e., that Brunell's and Stango's PTSD–DO's were caused by a single traumatic event or accident. The petitioners' arguments, that the so-called "discovery rule," through adoption of the occupational disease theory should apply, is a valiant but ultimately unpersuasive attempt. The statute of limitations prescribed by *N.J.S.A.* 34:15–51 is "a jurisdictional requirement and the petitioner must establish compliance therewith." *Schwarz,* 16 *N.J.* at 248, 108 *A.*2d 417. The compensation judge properly determined that the petitioners' PTSD–DO's were the result of single traumatic events and their claims were governed by *N.J.S.A.* 34:15–41 and *N.J.S.A.* 34:15–51.

As stated, we have no doubt that PTSD can be a compensable disorder under our workers' compensation act. *Prettyman* correctly so concludes. In these cases before us, if the claims had been brought within two years and proven as alleged, they surely would have been compensable. Indeed, these two cases really do not involve "delayed onset" or even an invidious or pernicious onset and development. Petitioners' psychological and mental problems existed from the very outset according to their histories. These are unfortunate cases of delayed filings, four and six years after the traumatic events.

We cannot make exceptions from the general law for these cases even though our holding here may prompt increased filings of minor claims to protect against the two-year time-bar. Legislative action or Supreme Court reinterpretation of the Compensation Act are available, of course. But we are bound by *Schwarz.*

Affirmed.