822 A.2d 576

DIANA G. BRUNELL, PETITIONER–APPELLANT, v.
WILDWOOD CREST POLICE DEPARTMENT,
RESPONDENT–RESPONDENT.

SAMUEL STANGO, PETITIONER–APPELLANT, v.
LOWER TOWNSHIP POLICE DEPARTMENT,
RESPONDENT–RESPONDENT.

Argued January 6, 2003—Decided May 21, 2003.

226

228

*Christine DiMuzio,* argued the cause for appellant Diana G. Brunell (*Hoffman, DiMuzio & Hoffman,* attorneys).

*Carmine J. Taglialatella,* argued the cause for appellant Samuel Stango (*Press & Long,* attorneys).

*Michael S. Affanato,* argued the cause for respondents (*Margolis Edelstein,* attorneys).

The opinion of the Court was delivered by

LONG, J.

These consolidated appeals present the issue of whether Post Traumatic Stress Disorder (PTSD) is an "accidental injury" or an "occupational disease" under the workers' compensation statute. We conclude that the condition may qualify, depending on the circumstances, as either and that when the facts of a case straddle both categories, a worker is entitled to file both claims. Finally, we hold that in the narrow band of accident cases that result in latent or insidiously progressive injury, the accident statute of limitations does not begin to run until the worker knows or should know that he has sustained a compensable injury.

I

A.

*Brunell v. Wildwood Crest Police Department*

In 1995, Petitioner Diana Brunell was employed by respondent Wildwood Crest Police Department as a civilian police dispatcher. On June 2, she dispatched Officer Eugene Miglio to the scene of a vehicle stop. A scuffle ensued, during which the suspect struck Miglio on the chest. As a result, Miglio suffered a cardiac arrest

and died later that night. Although Brunell did not witness the incident directly, in addition to sending Miglio to the scene of his death, she called for medical assistance, informed and consoled other members of the police department, and arranged for notification of Officer Miglio's widow. Immediately after the incident, Brunell suffered "symptoms of anxiety, depression, nightmares, irritability, fatigue, insomnia, and exaggerated startle response." She became more tense as time passed.

In June 1999, Brunell began to experience difficulty at work, including disagreements with co-workers and other "emotional problems." As a result, she was suspended for a week. The following month, a psychologist retained by the Department, Dr. Richard Cohen, diagnosed Brunell with a major depressive disorder. Brunell continued to see Dr. Cohen, who, on a subsequent visit, advised that Brunell "should not return to work." Dr. Cohen also referred Brunell for further psychological evaluation. On August 20, 1999, Brunell was examined by Dr. William Miley and was diagnosed with PTSD as the direct result of Officer Miglio's death in 1995.

On September 9, 1999, the Department's insurer informed Brunell that her claim had been denied "for failure to report it in a timely fashion" and suggested that she pursue recovery through her private insurer. Dr. Miley then notified the insurer that

Ms. Diana Brunell is suffering from Post Traumatic Stress Disorder, with Delayed Onset (DSM IV–309.81). In this disorder, the symptoms do not occur until at least six months after the critical incident that initiated the condition. Ms. Brunell has noticed recently that she is experiencing symptoms of this disorder over which she has no control.

Dr. Miley reaffirmed that Brunell's symptoms were the direct result of the 1995 incident.

On January 6, 2000, Brunell filed a claim petition seeking workers' compensation. In the petition, she declared that the date of her accident or occupational exposure was June 2, 1995, and that she suffered from delayed onset PTSD as a result of Officer Miglio's death. On April 3, 2000, the Department denied relief for

"failure to timely file a claim for an injury which occurred on June 2, 1995" and ultimately moved to dismiss the claim petition.

## B.

### Stango v. Lower Township Police Department

Petitioner Samuel Stango was a uniformed patrolman for the Lower Township Police Department for nine years, prior to his honorable resignation in 2000. On February 18, 1994, Stango and a fellow officer, David Douglass, responded to the scene of a domestic dispute. When they arrived, the officers split up and took separate routes around the property. As Stango approached the backyard, he heard what sounded like gunshots. Stango found Douglass lying on the ground, the victim of a shooting in the throat. Stango held Douglass, who was bleeding from the mouth and ears, and watched him die. Following the incident, Stango noticed an increased anxiety level and began "having problems with awakening at night with panic feelings, anxiety and sweats, coupled with flashbacks and bad dreams." He continued to work, however, without reporting his symptoms to the Lower Township Police Department because he felt that "it would just go away over time."

In February 2000, Stango experienced what he called a "trigger incident" that led to a considerable increase in his anxiety level. He was carrying balloons into his house for his twin daughters' birthday party when one of the balloons burst. The "pop" sound triggered a flashback that was "extremely intense and anxiety provoking." That experience, in turn, set off a series of disturbing dreams involving snipers.

After the February incident, Stango sought help from several sources, including fellow officers, an FBI agent, and a "Stress Unit" on the Internet that referred him to a psychologist. On April 5, 2000, Stango discussed his troubles with his lieutenant who relieved him of his duties, requested the surrender of his

service weapon, and referred him to an Employee Assistance Program.

On April 13, 2000, Stango filed two claim petitions for Workers' Compensation, one alleging that the date of his accident or occupational exposure was February 13, 2000 (the date of the balloon-popping flashback), and the other identifying the date as February 18, 1994 (the initial shooting incident). The Department's insurer refused to cover Stango's treatment.

On May 3, 2000, Stango was treated by Dr. Lawrence Clinton, a psychiatrist who concluded that he suffers from "an ongoing, chronic post traumatic stress disorder with anxiety reaction secondary to the work related incident when his partner was shot and Mr. Stango observed his death." The doctor recommended psychotherapy, biofeedback, and medication.

On June 6, 2000, Stango filed a motion for medical and temporary disability benefits requesting payment for psychological/psychiatric treatment and payment for time lost due to his work-related injury. The Department filed an answer and a motion to dismiss for failure to comply with the time limitations set forth in *N.J.S.A.* 34:15–41 and –51.

## C.

Although the facts of their cases are quite distinct, because Brunell and Stango raised many of the same legal issues, and because both the Wildwood Crest and Lower Township Police Departments were represented by the same lawyer, the two cases were consolidated and argued together before a single Judge of Compensation. The judge granted the motions to dismiss because neither petition was filed within two years of the "accident."

The Appellate Division affirmed. *Brunell v. Wildwood Crest Police Dep't*, 348 *N.J.Super.* 180, 791 *A.2d* 1030 (2002). In so doing, the panel focused on whether the claims for compensation based on PTSD should be adjudicated under the two-year "accident" statute of limitations, *N.J.S.A.* 34:15–41 and *N.J.S.A.* 34:15–51, or under the less onerous discovery-rule limitations period

prescribed for "occupational diseases." *N.J.S.A.* 34:15–34. Rely-ing on *Prettyman v. State,* 298 *N.J.Super.* 580, 689 *A.2d* 1365 (App.Div.1997), and *Schwarz v. Federal Shipbuilding & Dry Dock Co.,* 16 *N.J.* 243, 108 *A.2d* 417 (1954), the court held that PTSD is compensable under the "accident" provision of the workers' com-pensation statute when it arises from a single event. *Id.* at 189–92, 791 *A.2d* 1030. Citing *Schwarz,* the panel stated: "[O]urs is an 'accident' statute and not an 'injury' statute. Our courts have found no indication of a legislative purpose to suspend the running of the statute until the injury becomes manifest." *Brunell, supra,* 348 *N.J.Super.* at 191, 791 *A.2d* 1030 (citing *Schwarz, supra,* 16 *N.J.* at 251, 108 *A.2d* 417). Because the "accidents" suffered by Brunell and Stango preceded the filings by more than two years, the court ruled that the claims were properly dismissed. We granted certification, *Stango v. Lower Township Police Dep't,* 172 *N.J.* 359, 798 *A.2d* 1272 (2002) and *Brunell v. Wildwood Crest Police Dep't,* 174 *N.J.* 40, 803 *A.2d* 635 (2002), and now reverse.

## II

Brunell and Stango (collectively "claimants") essentially main-tain that PTSD is an occupational disease; that their time to file did not begin to run until they knew of their injuries; and that their claims are not barred by the two-year accident statute of limitations. The Departments acknowledge that PTSD can be characterized as either an accidental injury or an occupational disease, depending on the circumstances, but argue that when it arises out of a single unexpected or untoward event, it is classifia-ble only as an accidental injury, and thus is subject to the two-year accident statute of limitations. According to the Depart-ments, therefore, both claimants are out of time. In order to evaluate the claimants' contentions, both the relevant statutes and PTSD require explication.

## III

With the passage of the New Jersey Workers' Compensation Act in 1911, employees who previously had encountered great

difficulty in obtaining tort recompense for work-connected injuries became entitled to compensation for medical expenses and lost wages for such injuries, without proving fault. Monroe Berkowitz, *Workmen's Compensation: The New Jersey Experience* 3–5 (1960); *L.* 1911, c. 95, § 7. The statute initially swept in only typical industrial accidents; however, "it rapidly became apparent that the new law failed to cover many of the developing hazards of industrial production, specifically the hazards of occupational disease resulting from exposure to toxic substances." Suzanne Nussbaum & James Boskey, *The Consumers League of New Jersey and the Development of Occupational Disease Legislation*, 4 *Seton Hall Legis. J.* 101, 110–11 (1979).

In 1924, the Legislature amended the compensation statutes to include toxic exposure cases. *L.* 1924, c. 124, § 1(22b). Under the 1924 statute, a worker was covered for specifically delineated diseases [1] but only if the disability was reported within five months of the last exposure and the claim was filed within one year thereof. *Ibid.* Because "many of these diseases could manifest years after exposure, the limitations posed a serious problem." Nussbaum & Boskey, *supra*, 4 *Seton H. Legisl. J.* at 124. It was not until 1948 that the Legislature loosened the statute of limitations for occupational diseases by adding a two-year discovery rule, although maintaining an absolute five-year statute of repose. *L.* 1948, c. 468, § 2. A year later, the Legislature amended the section to cover all occupational diseases. *L.* 1949, c. 29, § 2. Eventually in 1974, in recognition of the insidious nature and delayed onset of many occupational diseases and the difficulty in pinpointing the exact date the disease process began, the five-year statute of repose was repealed, leaving only the discovery rule. *L.*

---

[1] Compensable occupational diseases were limited to "anthrax; lead poisoning; mercury poisoning; arsenic poisoning; phosphorous poisoning; poisoning from benzene and its homologues, and all derivatives thereof; wood alcohol poisoning; chrome poisoning; caisson disease; mesothorium or radium poisoning." *L.* 1924, c. 124, § 1(22b).

1974, c. 65, § 1.[2]

 Because of the ameliorative effect that the Act was intended to achieve (swift recompense for injured employees), it has been characterized as important social legislation. *Torres v. Trenton Times Newspaper,* 64 *N.J.* 458, 461, 317 *A.2d* 361 (1974); *Churukian v. Unarco Indus., Inc.,* 169 *N.J.Super.* 122, 125, 404 *A.2d* 343 (App.Div.), *certif. denied* 81 *N.J.* 352, 407 *A.2d* 1225 (1979). As a salutary remedial enactment, it is entitled to liberal construction in order to comport with its presumptive beneficence. *See Fiore v. Consolidated Freightways,* 140 *N.J.* 452, 465, 659 *A.2d* 436 (1995) (using liberal construction of workers' compensation statute to find that heart disease arising from occupational exposure to carbon monoxide was compensable); *Paul v. Baltimore Upholstering Co.,* 66 *N.J.* 111, 136, 328 *A.2d* 610 (1974) ("[O]ur courts have not hesitated in the past to construe the workmen's compensation act so as to comport with its presumptive beneficent and remedial objectives."). Overall, the statute is to be construed to bring as many cases as possible within its coverage. *Lindquist v. City of Jersey City Fire Dept.,* 175 *N.J.* 244, 258, 814 *A.2d* 1069 (2003) (stating that social goal of Act to "implement legislative policy of affording coverage to as many workers as possible" applied "whether the claim involves an accidental injury or occupational disease, or whether the focus is on a well-established or a modern health condition"); *see also Dawson v. Hatfield Wire & Cable Co.,* 59 *N.J.* 190, 197, 280 *A.2d* 173 (1971) (construing "wife" broadly so as to bestow death benefits to committed, non-married partner of deceased employee); *Conley v. Oliver &*

---

2 In 1979, the Legislature passed a series of reforms that raised the bar to recovery for occupational diseases. Most important, the amendments significantly narrowed the definition of "occupational disease" by requiring that a claimant demonstrate that the disease was due "in a material degree" to the workplace exposure. *L.* 1979, c. 283, § 10. For a detailed discussion of the 1979 reforms, see Hon. Fred H. Kumpf, *Occupational Disease Claims Under the Workers' Compensation Reforms,* 12 *Seton Hall L.Rev.* 470 (1982); *see also Fiore v. Consolidated Freightways,* 140 *N.J.* 452, 468-70, 659 *A.2d* 436 (1995) (discussing 1979 amendments).

*Co.,* 317 *N.J.Super.* 250, 257, 721 *A.*2d 1007 (App.Div.1998) (defining "employee" broadly to include claimant who was functional employee even though he bore official title of "independent contractor"). That is the backdrop against which the relevant statutory provisions are to be viewed.

## IV

As indicated, our workers' compensation scheme provides a remedy to an employee who suffers injury "arising out of and in the course of employment" either by accident, *N.J.S.A.* 34:15–7, or by contracting a compensable occupational disease, *N.J.S.A.* 34:15–34. The schedule of benefits is the same under both statutes, *N.J.S.A.* 34:15–32, although different notice and claim provisions are applicable.

## A.

■ Following the accidental injury format adopted by the vast majority of states, *N.J.S.A.* 34:15–7 provides in relevant part:

When employer and employee shall by agreement, either express or implied, as hereinafter provided, accept the provisions of this article, compensation for personal injuries to, or for the death of, such employee by accident arising out of and in the course of employment shall be made by the employer without regard to the negligence of the employer....

*See* 2 Arthur Larson, *Larson's Workers' Compensation Law* § 42.10 at 42–1 (2000) (summarizing "by accident" statutory provisions). The statute does not define "by accident"; however, it has been held that an accident "is an unlooked for mishap or an untoward event which is not expected or designed." *Klein v. New York Times Co.,* 317 *N.J.Super.* 41, 44, 721 *A.*2d 29 (App.Div.1998) (quoting *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N.J.* 127, 134, 141 *A.*2d 761 (1958)); *see also* Larson, *supra,* § 42.02 at 42–4 ("The basic and indispensable ingredient of 'accident' is unexpectedness."). Obviously, it is not the mere mishap that triggers the compensation statute, but the mishap in combination with the statutory requirement of "personal injuries." *N.J.S.A.* 34:15–7. To be an accident, what must be present is an "unintended or

unexpected occurrence *which produces hurt or loss." Spindler v. Universal Chain Corp.*, 11 *N.J.* 34, 38, 93 *A.*2d 171 (1952) (emphasis added) (quoting *Ismay v. Williamson*, [1908] *A.C.* (Eng.) 437 (P.C.1908)).

■ Indeed, the entire workers' compensation law is based on disability caused by injury. *Cureton v. Joma Plumbing & Heating Co.*, 38 *N.J.* 326, 331, 184 *A.*2d 644 (1962). A worker simply has no claim unless he can demonstrate either temporary or permanent disability. *N.J.S.A.* 34:15–12 (providing schedule of payments for temporary disability, partial permanent disability, and total permanent disability). The former requires lost wages; the latter proof of a medical condition that materially "restricts the function of the body or of its members or organs" and the claimant's ability to work. *See N.J.S.A.* 34:15–36 (defining permanent partial disability and permanent total disability); *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 114–16, 469 *A.*2d 22 (1984) (holding permanent partial disability to be premised on showing of either "lessen[ing] of working ability" or "injury [that] substantially interferes with other, nonwork-related aspects of ... life"); *Electronic Assocs., Inc. v. Heisinger*, 111 *N.J.Super.* 15, 20–21, 266 *A.*2d 601 (App.Div.1970) (holding that claimant could not recover for temporary disability when she did not lose any wages). Obviously, none of those standards can be satisfied without injury.

■ That principle is underscored by the statute, which denominates "the occurrence of the injury" as the trigger for an employee to notify the employer. *N.J.S.A.* 34:15–17. That provision serves to insulate employers from having to investigate an onslaught of passing incidents that do not result in injury and therefore do not constitute accidents under the statute. *Panchak v. Simmons Co.*, 15 *N.J.* 13, 22–23, 103 *A.*2d 884 (1954) (citing *Hines v. Norwalk Lock Co.*, 100 *Conn.* 533, 124 *A.* 17 (1924)). Further, an accident claim cannot be filed unless the "injury" and its "extent and character" are described, thus obviating the possibility of filing a claim when injury is absent. *N.J.S.A.* 34:15–51.

A "second ingredient" that has been added to the notion of injury by accident in most jurisdictions is that the injury must be traceable, within reasonable limits, to a definite time, place, occasion or cause. Larson, *supra*, § 42.02 at 42–4; *Liondale Bleach, Dye & Paint Works v. Riker,* 85 *N.J.L.* 426, 429, 89 *A.* 929 (Sup.Ct.1914) (adopting English definition of "accident" that "where no specific time or occasion can be fixed upon as the time when the alleged accident happened, there is no injury by accident within the meaning of the act"); *Snoden v. Watchung Borough,* 29 *N.J.Super.* 41, 46, 101 *A.*2d 583 (App.Div.1953) (defining accident as "an event happening at a specific time or occasion"), *aff'd,* 15 *N.J.* 376, 104 *A.*2d 841 (1954). When an untoward event occurring at a definite time causes a definite injury, Larson observes that "one has the clearest example of a typical industrial accident, in the colloquial sense: collisions, explosions, slips, falls, and the like, leading to obvious traumatic injuries." Larson, *supra*, § 42.02 at 42–6.

### B.

■ *N.J.S.A.* 34:15–31 defines "compensable occupational disease" as including

> all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.

By "characteristic of or peculiar to" is meant conditions that one engaged in that particular employment would view as creating a likely risk of injury. Those conditions must "cause" the disease as a natural incident of either the occupation in general or the place of employment. *Walck v. Johns–Mansville Prods. Corp.,* 56 *N.J.* 533, 556, 267 *A.*2d 508 (1970) (stating that injury "must be due in some realistic sense and material degree to a risk reasonably incidental to the employment; [it] must issue from or be contributed to by conditions which bear some essential relation to the work or its nature"). In other words, there is attached to that job a hazard that distinguishes it from the usual run of occupations. *See Lindquist, supra,* 175 *N.J.* at 263, 274–75, 814 *A.*2d 1069

(relying on medical epidemiological articles and expert testimony to conclude that firefighter claimant had demonstrated "by a preponderance of the evidence that his or her environmental exposure while fighting fires was a substantial contributing cause" of emphysema despite fact that claimant was also smoker); *Magaw v. Middletown Bd. of Educ.*, 323 *N.J.Super.* 1, 731 *A.*2d 1196 (App.Div.), *certif. denied* 162 *N.J.* 485, 744 *A.*2d 1208 (1999) (granting compensation in case in which claimant developed lung cancer after twenty years of on-site exposure to co-worker's secondhand smoke).

In differentiating between accidental injury and occupational disease, Larson observes that the basic "unexpectedness" ingredient of accident is absent in an occupational disease:

> The cause is characteristic harmful conditions of the particular industry. The result is a kind of disability which is not unexpected if work under these conditions continues for a long time. And the development is usually gradual and imperceptible over an extended period.
>
> [Larson, *supra*, § 42.02 at 42–6.]

## C.

In most instances, when a worker is hurt on the job the claim is easily classifiable. For example, a worker who loses a finger due to a malfunctioning machine clearly has suffered an untoward or unexpected event resulting in hurt or loss. That is an accidental injury. Conversely, a worker who has developed emphysema, over time, due to continued toxic exposure in a chemical plant, plainly has experienced an occupational disease.

In a narrow band of cases, however, the denomination of exactly what the worker has suffered and when he has suffered it is less clear. According to Larson, those are the cases that fall somewhere between the two extremes and constitute a fruitful source of litigation. Larson, *supra*, § 42.02 at 42–6. This is one of them.

## V

The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, states:

The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stress or involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate.

[American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 463 (4th ed. 2000) ("DSM–IV").]

The development of a concise diagnosis for that set of psychological symptoms began in the late nineteenth century when the first forays into psychological treatment began to address the issue of "hysteria." Symptoms of motor loss, convulsions, amnesia, and hyper-vigilance were examined and determined to be the result of a mental disorder peculiar to women. Judith Herman, *Trauma and Recovery* 10–12 (1997). Later, during and after the First World War, similar symptoms were discovered in men whose wartime experiences had left them "shell-shocked."

Interest in the lasting mental effects of trauma remained strong through the Second World War, as psychologists struggled to treat soldiers who had witnessed, perpetrated, and been subject to the atrocities of war. *Id.* at 20, 26. But it was not until the Vietnam War that a broader political and psychological inquiry into the effects of combat trauma was undertaken. The experiences of Vietnam veterans who spoke out about the persistent mental difficulties that they had faced as a result of the traumatic incidents of combat led to a far-reaching rethinking of the ways in which trauma affects the individual psyche. *Id.* at 27. Posttraumatic stress disorder was recognized as a mental disorder and added to the DSM–IV in 1980, largely as a result of the grassroots efforts of Vietnam veterans and their allies to give credence to the symptomology that plagued so many soldiers who had returned from that conflict. *Id.* at 28.

Since its initial application to combat trauma, large-scale diagnoses of PTSD have been made in cases of survivors of domestic violence and childhood sexual abuse, asylum-seekers fleeing political violence and torture, survivors of natural disasters, and, most

recently, rescue workers and others involved in the September 11, 2001, terror attacks on the World Trade Center and the Pentagon. Karen E. Krinsley & Frank W. Weathers, *The Assessment of Trauma in Adults*, 6 *PTSD Res. Q.* 1, 1–2 (Summer 1995) (describing wide variety of traumas that can lead to PTSD); National Institute of Mental Health, *Reliving Trauma: Post–Traumatic Stress Disorder*, Publication No. 01–4597 (2001), available at http://www.nimh.nih.gov/publicat/reliving/cfm (discussing widespread appearance of PTSD in aftermath of September 11th attacks).

The diagnostic criteria for PTSD are as follows:

A. The person has been exposed to a traumatic event in which both of the following have been present:

1. the person has experienced, witnessed, or been confronted with an event or events that involve actual or threatened death or serious injury, or a threat to the physical integrity of oneself or others.

2. the person's response involved intense fear, helplessness, or horror. Note: in children, it may be expressed instead by disorganized or agitated behavior.

B. The traumatic event is persistently re-experienced in *at least one* of the following ways:

1. recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions. Note: in young children, repetitive play may occur in which themes or aspects of the trauma are expressed.

2. recurrent distressing dreams of the event. Note: in children, there may be frightening dreams without recognizable content.

3. acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur upon awakening or when intoxicated). Note: in children, trauma-specific reenactment may occur.

4. intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.

5. physiologic reactivity upon exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by *at least three* of the following:

1. efforts to avoid thoughts, feelings, or conversations associated with the trauma

2. efforts to avoid activities, places, or people that arouse recollections of the trauma

3. inability to recall an important aspect of the trauma

4. markedly diminished interest or participation in significant activities
5. feeling of detachment or estrangement from others
6. restricted range of affect (e.g., unable to have loving feelings)
7. sense of foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D. Persistent symptoms of increasing arousal (not present before the trauma), indicated by *at least two* of the following:

1. difficulty falling or staying asleep
2. Irritability or outbursts of anger
3. Difficulty concentrating
4. Hyper-vigilance
5. Exaggerated startle response

E. Duration of the disturbance (symptoms in B, C, and D) is more than one month.

F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

[DSM–IV, *supra*, at 467–68 (emphasis added).]

As can be seen from the foregoing, a diagnosis of PTSD can cover a broad variety of stressors and symptoms. It may result from a single traumatic event such as a fire or explosion that causes or threatens death or serious injury to the witness or others. Glenn R. Schiraldi, *The Post–Trumatic Stress Disorder Sourcebook* 1 (2000); Herbert Lasky, 1 *Psychiatric Claims in Workers' Compensation and Civil Litigation* 16 (1993). It may also result from continued exposure to traumatic events such as occurs in combat, undercover police work, domestic abuse, or childhood sexual abuse. Jimmy P. Mann & John Neece, *Workers' Compensation for Law Enforcement Related Post Traumatic Stress Disorder*, 8 *Behav. Sci. & L.* 447, 447–48 (1990) (describing wide variety of stressors that result in police officers suffering from PTSD and stating that officers experiencing cumulative traumas are much more likely to develop PTSD); Krinsley & Weathers, *supra*, 6 *PTSD Res. Q.*, at 1 2 (suggesting that some cases of PTSD may result from culmination of traumatic events over span of time).

Symptoms may present quickly and last less than three months, in which case the PTSD is denominated as "acute." If symptoms last more than three months, the condition is called "chronic."

Schiraldi, *supra*, at 6; Mann & Neece, *supra*, 8 *Behav. Sci. & L.* at 49 (noting that after police officer witnesses traumatic event, PTSD symptoms may last days or several years). Although the symptoms may appear immediately after a traumatic event, they also may remain dormant until at least six months or more have passed, in which case the PTSD is specified as "with delayed onset." Schiraldi, *supra*, at 6. In short, PTSD is a catchall phrase for an array of reactions to stress that can arise in various employment settings.

## VI

There is no question but that PTSD is cognizable under the workers' compensation statutes. With the passage of time, our courts have come to recognize legitimate mental stress claims as a compensable psychiatric disability. *See Saunderlin v. E.I. DuPont Co.*, 102 *N.J.* 402, 410, 508 *A.*2d 1095 (1986); *Margaritondo v. Stauffer Chem. Co.*, 217 *N.J.Super.* 565, 526 *A.*2d 711 (App.Div.) *on remand from* 104 *N.J.* 388, 517 *A.*2d 394 (1986). Indeed, Larson credits New Jersey with leading the way in recognizing the so-called mental-mental category of compensable injury—that is, cases in which a purely mental stimulus results in emotional or nervous injury. Larson, *supra*, § 56.04[1] at 56–16; *see, e.g., Simon v. R.H.H. Steel Laundry, Inc.*, 25 *N.J.Super.* 50, 95 *A.*2d 446 (Hudson County Ct.), *aff'd* 26 *N.J.Super.* 598, 98 *A.*2d 604 (App.Div.), *certif. denied* 13 N.J. 392, 99 A.2d 859 (1953) (holding that purely mental injury suffered by railway worker following explosion in boiler room was compensable as accidental injury).

Moreover, PTSD already has been recognized in our case law. In *Prettyman, supra*, 298 *N.J.Super.* at 585–87, 689 *A.*2d 1365, the claimant, a clerk at the Attorney General's Office, was traumatized and immediately suffered PTSD symptoms following a single incident of unduly harsh treatment at the hands of police who were investigating a crime within her office. The court declared Prettyman's PTSD to constitute an accidental injury. *Id.* at 597, 689 *A.*2d 1365.

That result also has been reached by a number of our sister states that provide workers' compensation for purely mental injuries. *See generally* George Chamberlain, *Psychiatric Claims in Workers' Compensation and Civil Litigation* 27–48 (Supp.2002) (summarizing cases either granting or denying benefits for PTSD). The majority of those states have compensated PTSD as an accidental injury. Generally, each case has involved PTSD that resulted in proximity to one or two traumatic events. *See, e.g., Matlock v. Indus. Comm'n,* 321 *Ill.App.*3d 167, 253 *Ill.Dec.* 930, 746 *N.E.*2d 751 (2001) (awarding benefits for PTSD suffered by flight attendant who had scuffle with passenger); *Brown v. Quik Trip Corp.,* 641 *N.W.*2d 725 (Iowa 2002) (awarding benefits as accidental injury in case in which convenience store clerk suffered PTSD as result of combined trauma of two distinct events: shootout between customers and armed robbery); *Sparks v. Tulane Med. Ctr. Hosp. & Clinic,* 546 *So.*2d 138 (La.1989) (finding that improper employee harassment and threats by investigating police constituted "accident" for purposes of workers' compensation statute); *Belcher v. T. Rowe Price Found., Inc.,* 329 *Md.* 709, 621 *A.*2d 872 (1993) (overruling appellate decision that denied benefits for secretary suffering from PTSD after witnessing construction accident); *Wood v. Laidlaw Transit, Inc.,* 77 *N.Y.*2d 79, 564 *N.Y.S.*2d 704, 565 *N.E.*2d 1255 (1990) (awarding accident benefits to school bus driver who suffered PTSD after witnessing gruesome car accident); *Jordan v. Cent. Piedmont Cmty. Coll.,* 124 *N.C.App.* 112, 476 *S.E.*2d 410 (N.C.Ct.App.1996) (permitting prison instructor to bring accidental injury claim for PTSD arising from witnessing prison brawl); *Bailey v. American Gen. Ins. Co.,* 154 *Tex.* 430, 279 *S.W.*2d 315 (1955) (permitting compensation for claimant who witnessed co-worker plummet eight stories off scaffolding to his death); *Daniel Const. Co. v. Tolley,* 24 *Va.App.* 70, 480 *S.E.*2d 145 (1997) (permitting accident recovery in case in which claimant suffered PTSD following large explosion at work).

None of the cited cases addressed the cognate issue of whether PTSD also could qualify as an occupational disease, presumably because none of the injured workers in fact made such a claim and

because PTSD was not a condition that naturally was regarded as incident to the work in question. That issue, however, has been answered by the courts of Colorado, Maryland, North Carolina, and Virginia. Those courts have concluded that, depending on the facts, PTSD may be either an occupational disease or an accidental injury.[3]

Generally speaking, each of those cases found PTSD to be an occupational disease when it developed over time from multiple stressors unique to the employment. *Means v. Baltimore County*, 344 *Md.* 661, 689 *A.*2d 1238 (1997) (holding that lower court erred when it found as matter of law that PTSD could not be occupational disease in case in which claimant was fire department medic and alleged that PTSD arose from several work-related incidents); *Pulley v. City of Durham*, 121 *N.C.App.* 688, 468 *S.E.*2d 506 (1996) (awarding benefits under occupational disease statute to police officer with delayed-onset PTSD arising from multiple stressors); *City of Aurora v. Industrial Comm'n of Colo.*, 710 *P.2d* 1122, 1123 (Colo.Ct.App.1985) (awarding benefits to undercover police officer who suffered PTSD arising from generally traumatic work conditions because "no principled ground" exists to distinguish between accidental injury and occupational disease for purposes of compensating PTSD) (citing 1B A. Larson, *Workmen's Compensation Law* § 42.23 (1982)); *Fairfax County Fire & Rescue Dep't v.*

---

[3] Although several out-of-state cases have denied compensation for PTSD as an occupational disease, they are not particularly relevant, insofar as each was based on additional requirements for mental illness claims that are not present in the New Jersey scheme. *See Biasetti v. City of Stamford*, 250 *Conn.* 65, 735 *A.*2d 321 (1999) (finding claim for PTSD not compensable under Connecticut Workers' Compensation statute because illness did not arise from physical injury); *Gatlin v. City of Knoxville*, 822 *S.W.*2d 587, 591–92 (Tenn.1991) (holding that to be either compensable occupational disease or accidental injury, PTSD must arise out of sudden, unexpected incident); *Rambaldo v. Accurate Die Casting*, 65 *Ohio St.*3d 281, 603 *N.E.*2d 975 (1992) (denying coverage of PTSD because purely mental claims not allowed); *Andolsek v. City of Kirkland*, 99 *Ohio App.*3d 333, 650 *N.E.*2d 911 (1994) (denying coverage for PTSD as occupational disease due to lack of physical injury); *Osborne v. City of Okla. City Police Dep't*, 882 *P.*2d 75 (Okla.1994) (denying coverage for PTSD as either accidental injury or occupational disease when unaccompanied by physical injury).

*Mottram*, 263 *Va.* 365, 559 *S.E.*2d 698 (2002) (reversing denial of benefits for fireman who developed PTSD following many years of responding to emergency calls including "incidents such as airplane crashes, amputations and decapitations, automobile accidents with multiple victims, shootings, stabbings, and house fires with fatalities of entire families," and holding claimant met statutory requirements for occupational disease).

■ We think the cases that have concluded that PTSD can qualify either as an accidental injury or an occupational disease, depending on the facts, are closest to the mark. PTSD simply is not a monolithic disease with a uniform structure that does not permit of individual variation. As we have indicated, a diagnosis of PTSD encompasses an array of symptoms, stressors and details of onset and can occur in a variety of employment settings. Thus, *Prettyman* and the majority of out-of-state cases correctly recognized a worker's accidental injury claim for PTSD when the condition arose from a single traumatic event that generated immediate symptoms and was not caused by the peculiar conditions of the employment. Colorado, Maryland, North Carolina and Virginia likewise correctly recognized PTSD as an occupational disease when it arose out of recurrent traumatic events experienced by policemen, firemen and rescue workers, the conditions of whose employment compelled regular exposure to such traumas with expectable consequences. Each of the aforementioned characterizations is perfectly apt. There simply is nothing inherent in a diagnosis of PTSD that would preclude its treatment either as an accidental injury or an occupational disease, depending on the facts.

That reading of the statute accords most fully with its beneficial aims. Any pigeonholing of PTSD into one or the other of the statutory categories would have the effect of excluding whole classes of workers from coverage. For example, classifying PTSD as exclusively "accidental" would eliminate from coverage all workers who did not suffer an identifiable traumatic event but developed PTSD over time from multiple stressors. Similarly,

classifying PTSD as exclusively "occupational" would exclude workers who developed PTSD in the myriad of everyday jobs that that do not bear a special hazard that would qualify under the occupational disease statute. Neither of those options conforms with the interpretative rules governing workers' compensation, particularly the rule that courts must "implement the legislative policy of affording coverage to as many workers possible." *Lindquist, supra,* 175 *N.J.* at 258, 814 *A.*2d 1069; *see also Petrozzino v. Monroe Calculating Mach. Co., Inc.,* 47 *N.J.* 577, 578–79, 222 *A.*2d 73 (1966) (looking beyond plain language of statute to find that child of working mother was entitled to equal presumption of dependency as other children of deceased claimants even though statute was not gender neutral); *McKenzie v. Brixite Mfg. Co.,* 34 *N.J.* 1, 8, 166 *A.*2d 753 (1961) ("We cannot find a legislative intent that by favoring one class the Legislature intended to exclude other classes."); *Ciuba, supra,* 27 *N.J.* at 137–38, 141 *A.*2d 761 (interpreting "accident" liberally so as to compensate employee who suffered heart attack several days after installing 200–pound oven); *Conley, supra,* 317 *N.J.Super.* at 254, 721 *A.*2d 1007 (construing "employee" broadly in accordance with legislative intent to cover as many workers as possible and finding claims adjuster who was hired temporarily to be "employee" for purposes of Act); *Hannigan v. Goldfarb,* 53 *N.J.Super.* 190, 195, 147 *A.*2d 56 (App.Div.1958) (finding taxi driver to be "employee" for purposes of Act despite official title as independent contractor).

■ The Departments do not quarrel with the notion that PTSD can be characterized as an accidental injury or an occupational disease, depending on the facts. They would place a limitation on that flexibility, however, arguing that if a worker can trace his injury to a single traumatic event, it must be denominated an accident, and if so, the worker cannot advance an occupational disease claim. In support of that contention, they cite *N.J.S.A.* 34:15–35, which provides:

All provisions of this article and article 3 of this title (§ 34:15–36 *et seq.*) applicable to claims for injury or death by accident, shall apply to injury or death by compensable occupational disease, except to the extent that they are inconsistent

with the provisions contained in sections 34:15–30 to 34:15–34 of this title. The provisions in said sections 34:15–30 to 34:15–34 shall not apply to any claim for compensation for injury resulting from accident.

We disagree with the Departments' analysis. We do not interpret *N.J.S.A.* 34:15–35 as a legislative preclusion of any claim. Indeed, it is *N.J.S.A.* 34:15–30 that expressly sets out the exceptions that the Legislature deemed applicable to an occupational disease claim: self-exposure to a known hazard and failure to use a safety device. Injury due to a single traumatic event is not included in those exceptions. We read *N.J.S.A.* 34:15–35 as a reaffirmation of the fact that there are discrete statutory provisions relative to accidental injury and occupational disease. In other words, accident claims should satisfy the requirements of the accident statute and occupational disease claims should satisfy the requirements of the occupational disease statute.

■ More importantly, the Departments are wide of the mark in concluding that the mere happening of a definable traumatic event automatically equates with an accident for workers' compensation purposes. To be sure, in the absence of a definable traumatic event, there is no accident. *Liondale Bleach, supra,* 85 *N.J.L.* at 429, 89 *A.* 929. But it does not follow that the mere existence of a traumatic event fully satisfies the accident standard. As stated previously, unexpectedness and injury equally are critical to the definition of accident. Larson, *supra,* § 42.02 at 42–6. Thus, there is nothing about a single, traumatic event, standing alone, that would preclude a worker from filing an occupational disease claim, so long as the claimant otherwise met the relevant statutory standards. Indeed, the worker is free to file both claims. *See Fiore, supra,* 140 *N.J.* at 462, 659 *A.*2d 436 (considering simultaneous claims for either occupational disease or heart disease due to strain and concluding that slow-developing nature of claimant's condition best fits occupational disease definition, as claim did not meet traumatic requirement under *N.J.S.A.* § 34:15–7.2); *Mitchell v. Mucon Corp.,* 51 *N.J.Super.* 208, 212, 143 *A.*2d 802 (Essex County Ct.1958) (noting that claimant was permitted to amend claim to include occupational disease claim along with

accidental injury claim for back injury and upholding claimant's award for occupational disease).

When a worker files both claims simultaneously, the preliminary proofs will be the same because an accidental injury and an occupational disease both must arise out of and in the course of employment. The dividing line is that in order to prove an occupational disease, the worker must establish that his condition was not unexpected but that it was "due in material degree to causes and conditions which are or were characteristic of or peculiar to the particular trade, occupation, process or place of employment." *N.J.S.A.* 34:15–31. Upon the submission of the proofs, the Division of Workers' Compensation will evaluate them in light of both standards and determine which, if either, is the appropriate benchmark. Under that methodology, a worker who fell short on proof that his injury resulted from the unique hazard of his job, nevertheless might have proved that he sustained an accidental injury as a result of an unexpected event. That interpretation accords most fully with the legislative intent "to bring as many cases as possible within the coverage of the Act." *Lindquist, supra,* 175 *N.J.* at 259, 814 *A.*2d 1069.

## VII

Part and parcel of determining the nature of the claims will be the issue of the timeliness of the filings. As we have indicated, different notice and claim provisions apply, depending upon how the worker's claim is characterized.

### A.

An employee claiming an occupational disease must notify his employer within ninety days after the employee "knew or ought to have known the nature of his disability and its relation to his employment," *N.J.S.A.* 34:15–33. Likewise, he must file a claim petition within two years after he "knew the nature of the disability and its relation to the employment." *N.J.S.A.* 34:15–36. In the occupational disease context, "knowledge of the 'nature' of

[the] disability connotes knowledge of the most notable character-
istics of the disease, sufficient to bring home substantial realiza-
tion of its extent and seriousness." *Earl v. Johnson & Johnson,*
158 *N.J.* 155, 163, 728 *A.*2d 820 (1999) (quoting *Bucuk v. Edward
A. Zusi Brass Foundry,* 49 *N.J.Super.* 187, 212, 139 *A.*2d 436
(App.Div.), *certif. denied,* 27 *N.J.* 398, 143 *A.*2d 9 (1958)).

B.

With respect to accidental injury, an employee must give notice
to the employer within ninety days of the occurrence "of the
injury," *N.J.S.A.* 34:15–17, and must file a claim petition within
two years of the date the "accident" occurred, *N.J.S.A.* 34:15–51.
Unless a claim petition is filed in accordance with *N.J.S.A.* 34:15–
51, the claim is barred. *N.J.S.A.* 34:15–41.[4]

There is usually very little problem in calculating the notice and
claim limitations periods for accidental injury because in classic
industrial accident cases, the injury and the unexpected traumatic
event are simultaneous. For example, a construction worker who
is struck by a boom or a crane and suffers disabling head injuries
must notify the employer and file a claim based on the date of the
striking because that is the date of the unexpected event that
caused injury – in other words – the accident.

That is not the case with delayed onset PTSD or any other
latent or progressive condition, for that matter. *See, e.g., Brown,
supra,* 641 *N.W.*2d at 726 (awarding compensation to convenience
store clerk who developed PTSD over one year after initial

---

[4] *N.J.S.A.* 34:14–41, enacted in 1913, was the original accident statute of
limitations. It provided simply that all claims filed more than one year after the
accident would be barred. *L.* 1913, c. 174, § 8. In 1921, in an effort to clarify
the statute, the Legislature enacted *N.J.S.A.* 34:15–51 that set out specific filing
requirements and stated that the petition was to be filed "within one year after
the date on which the accident occurred...." *L.* 1921, c. 229, § 1. In 1931, the
two sections were harmonized and amended to their present forms. *L.* 1931, c.
279, § 5; *L.* 1931, c. 280, § 1. Despite their apparent redundancy, they remain
in effect today.

shooting); *Mauldin v. Dyna–Color/Jack Rabbit*, 308 *S.C.* 18, 416 *S.E.*2d 639, 641 (1992) (awarding compensation when claimant suffered only intermittent minor knee pain and swelling until she was diagnosed with torn meniscus requiring surgery two and a half years later). Indeed, to be diagnosed with delayed onset PTSD, an employee cannot begin to suffer the symptoms of injury until at least six months or longer have passed since the trauma. PTSD is an example of an insidious disease process of which the worker is unaware at the time of the original traumatic event. The question presented is how, in those circumstances, to calculate the notice and claim provisions in the accident statute.

The Departments contend that *Schwarz, supra,* 16 *N.J.* at 243, 108 *A.*2d 417, provides the answer. There, the employee, while performing his job, was struck in the groin by a falling transom locker. *Id.* at 246, 108 *A.*2d 417. He was treated by a company doctor for pain and swelling in his right testicle. *Ibid.* Despite intermittently missing work due to pain and being informed within the statutory period by his private physician that his testicle might have to be removed, Schwarz did not file a claim until long after the two-year statute expired, when testicular cancer was diagnosed. *Id.* at 247, 108 *A.*2d 417. The court held Schwartz's claim barred because our statute requires the filing within two years of the accident regardless of when the exact "seriousness" of the harm becomes manifest. *Id.* at 251, 108 *A.*2d 417. A difference between *Schwarz* and the delayed onset and insidious development cases is revealed in the Court's language:

> [H]e was *aware* that he had suffered an injury at the time of the accident. He *knew* he was injured but he did not know he was suffering from a malignancy, and the fact that he did not learn of the malignancy until more than two years after the accident cannot be made to extend the statutory period.
>
> [*Ibid.* (emphasis added).]

*Schwarz* reflects the basic rule that when there is an unexpected traumatic event leading to an injury that results in lost wages, the incurring of medical bills, and a diagnosis of possible future surgery, and the worker knows he has suffered a compensable injury for workers' compensation purposes, the filing clock begins

to run and the employee cannot put off filing until the full extent of his injury is determined. Nothing in *Schwarz* (or any other reported decision) suggests even obliquely that the notice and claim statutes begin to run on a worker who is wholly unaware that he has suffered any injury whatsoever. *Schwarz* therefore does not answer the question presented here.

Here, and presumably in other delayed onset and insidious development cases, ascertainable disease symptoms emerge long after the time of the traumatic event. On the date of the initial incident, the worker is completely ignorant of an injury of which to notify the employer or with respect to which to file a claim. Indeed, it is theoretically possible for PTSD and other diseases with a quiescent period to remain dormant until more than two years after the traumatic event. If the statute is read to time the notice and the filing of a claim from the traumatic event, a worker's right could expire before there was any evidence whatsoever that he had been injured. The Departments claim that that is the correct reading of the statute because we are an "accident state" in which workers injured accidentally who suffer latent and progressive conditions are simply out of luck.

We conclude otherwise. Because the Workers' Compensation Act does not contemplate notice or the filing of a claim in the absence of injury, those time periods do not begin to run until the worker is, or reasonably should be, aware that he has sustained a compensable injury. Indeed, almost fifty years ago in *Panchak, supra,* 15 *N.J.* at 13, 103 *A.*2d 884, we declared that to be the law regarding notification of injury to the employer under the accident notice statute. *N.J.S.A.* 34:15–17. In that case, the worker felt a "sharp jab" in his back while lifting mattresses. *Panchak, supra,* 15 *N.J.* at 15, 103 *A.*2d 884. A month later, he experienced pain over his thigh. He saw several doctors and seven months later was diagnosed with a herniated disc. *Id.* at 16, 103 *A.*2d 884. At that point he advised the employer, who resisted payment because it had not been notified within ninety days of the injury pursuant to *N.J.S.A.* 34:15–17. Although recognizing that

the accidental injury notice provision is designed to afford to the employer the benefits of timely investigation and is mandatory, the Court nevertheless refused to accept the employer's argument that the lifting of the mattresses and the sharp jab triggered notification. Justice Jacobs, speaking for the Court, stated:

As was suggested in *Bobertz v. Hillside Township*, 125 *N.J.L.* 321, 323, 15 *A.*2d 796 (Sup.Ct.1940), [*aff'd*, 126 *N.J.L.* 416, 19 *A.*2d 801 (E. & A.1941)], workmen rightly "do not regard every slip in the day's work as a matter to be publicly recorded." The trivial daily bruises which do not result in incapacity or disability are not compensable (*Hercules Powder Co. v. Nieratko*, [113 *N.J.L.* 195, 200, 173 *A.* 606 (Sup.Ct.1934), *aff'd* 114 *N.J.L.* 254, 176 *A.* 198 (E. & A.1935)]) and any requirement that they forthwith be reported and investigated would place an undue burden on employees and employers alike. We find nothing in *R.S.* 34:15–17 which imposes such burden. It requires notice after the occurrence of the injury and provides that in the event of default, no compensation shall be due or allowed. It would seem clear from its terminology that the Legislature was referring to disabling or incapacitating injury for which compensation might be sought. *Cf. Textileather Corp. v. Great American, etc., Co.*, 108 *N.J.L.* 121, 124, 156 *A.* 840 (E. & A.1931). Despite the tremendous advancement of medical knowledge in relation to industrial accidents, no one can yet accurately foretell the consequences of seemingly trivial hurts, as the instant matter well illustrates. The sharp jab on March 19, 1951 was so fleeting that the employee, acting reasonably, thought nothing more of it. He could hardly have been expected to have then reported it to the foreman nor could he have been expected to relate it to his subsequent general ill feeling and pain in his thigh. It was not until he was examined by Dr. Ehrlich on November 1 *that he knew or had reason to know that he had a compensable injury* and then he immediately served notice on his employer. This notice may justly be deemed sufficient within the contemplation of the legislative requirement in *R.S.* 34:15–17.

[*Id.* at 24, 103 *A.*2d 884 (emphasis added).]

Although it is clear that *Panchak* was limited to the notification statute, its reasoning is equally applicable to the two-year claim filing limitation of *N.J.S.A.* 34:15–41 that runs, not from the injury, but from the date of the accident. As noted in Part IV, *supra*, there is no accident for the purpose of filing a claim without an injury. Likewise, we think that is the reason why filing a claim requires the description of the injury. *N.J.S.A.* 34:15–51; *N.J.A.C.* 12:235–3.1(a)(6). It is simply inconceivable to us that the Legislature contemplated knowledge of injury as a trigger for notifying the employer but not for filing a claim. *See LaFage v. Jani*, 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001) (alteration in original) (quoting *Jersey City Chap. Prop. Owner's Protective*

*Ass'n v. City Council*, 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969)) (" 'When all is said and done, the matter of statutory construction ... will not justly turn on literalisms, technisms, or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation.' "). Obviously, it is notice that should precede filing; yet, if the *Panchak* reasoning is limited to notification, the right to file a claim would expire before notice was required in many latency cases.

 We are, therefore, satisfied that in the limited class of cases in which an unexpected traumatic event occurs and the injury it generates is latent or insidiously progressive, an accident for workers' compensation filing purposes has not taken place until the signs and symptoms are such that they would alert a reasonable person that he had sustained a compensable injury. As Larson explains, it would be

> odd indeed to find, in a supposedly beneficent piece of legislation, the survival of this fragment of irrational cruelty surpassing the most technical forfeitures of statutes of limitation. Statutes of limitation generally proceed on the theory that one forfeits rights only when inexcusably delaying assertion of them. But here no amount of vigilance is of any help.
>
> [Larson, *supra*, § 31.02 at 661.]

That reasoning, to us, is pivotal.

 Statutes of limitations generally are designed to stimulate diligence in litigants and to protect defendants from the unfair surprise of stale claims. *Martinez v. Cooper Hosp.–University Med. Ctr.*, 163 *N.J.* 45, 51, 747 *A.*2d 266 (2000). As Larson points out, the former goal is not achieved by applying the statute to bar the claim of a worker who does not know he has been injured because no amount of diligence would have altered the result. Regarding stale claims, in *Panchak, supra*, Justice Jacobs said this:

> We are not impressed by the suggestion that this view may encourage questionable claims. The employee must still satisfactorily discharge his affirmative burden of establishing that his injury was work-connected and that he gave notice within the prescribed time after he knew or had reason to know that he had a compensable injury. *Measured against the shocking injustice to the workman which would*

*result from a stricter approach, the additional responsibility placed upon the employer seems rather inconsequential.*

[15 *N.J.* at 25, 103 *A.*2d 884 (emphasis added).]

We fully agree with that analysis, which we hold to be equally relevant to *N.J.S.A.* 34:15–34.

That is the conclusion that has been reached in the majority of our sister states addressing this issue. To be sure, some states have achieved that result by legislation. *See, e.g., Alaska Stat.* § 23.30.105 ("It is additionally provided that, in the case of latent defects pertinent to and causing compensable disability, the injured employee has full right to claim as shall be determined by the board, time limitations notwithstanding."); *Mass. Gen. Laws* ch. 152, § 41 ("No proceedings for compensation ... shall be maintained ... unless any claim for compensation due with respect to such injury is filed within four years from the date the employee first became aware of the causal relationship between his disability and his employment."); *N.D. Cent.Code* § 65–05–01 ("The date of injury for purposes of this section is the first date that a reasonable person knew or should have known that the employee suffered a work-related injury and has either lost wages because of a resulting disability or received medical treatment."); *R.I. Gen. Laws* § 28–35–57(a) (claims will be barred unless filed within two years of "the occurrence or *manifestation* of the injury or incapacity") (emphasis added).

Generally, however, and most likely because accident-related latent injury is such a narrow category that most legislation does not address it, courts have been left to fill in that legislative gap. Larson points out that whether the particular state statute times the statute of limitations from the accident or the injury, the great majority of courts have been sufficiently impressed with the "acute unfairness" of a literal application of a limitations period, regardless of the facts surrounding the onset of injury, that they have suspended the running of the accident statute in latency cases until by reasonable care and diligence it is apparent that an injury has been sustained. Larson, *supra,* § 126.05[02] at 126–20. Indeed, there are numerous examples of judicial construction of

"injury" statutes to provide a discovery rule in the case of latent injuries. *See, e.g., Hall's Cleaners v. Wortham,* 38 *Ark.App.* 86, 829 *S.W.*2d 424, 426 (1992) (citing *Ark.Code Ann.* § 11–9–501) (providing that statute of limitations commences to run "when the true extent of the injury manifests and causes an incapacity to earn wages for the period long enough to qualify a claimant to receive benefits."); *City of Boulder v. Payne,* 162 *Colo.* 345, 426 *P.*2d 194 (1967) (interpreting one-year statute of limitation running from "injury" to include discovery rule); *Rines v. Scott,* 432 *A.2d* 767, 771 (Me.1981) ("We hold that the incident triggering a personal injury arising out of and in the course of employment, *when present and subjectively connected together,* continues to mark the point of commencement of the time limitations ....") (emphasis added); *Lewis v. Chrysler Corp.,* 394 *Mich.* 360, 230 *N.W.*2d 538, 542 (1975) (reiterating utility of discovery rule and rejecting distinction between occupational diseases and personal injuries for purpose of establishing notice requirement with respect to statute of limitations); *Georgia Pac. Corp. v. Taplin,* 586 *So.*2d 823, 827 (Miss.1991) (reasoning that limitations period begins to run "when the claimant is or reasonably should be aware of having sustained compensable injury, but the statute is deemed not to have begun running if the claimant's reasonably diligent efforts to obtain treatment yield no medical confirmation of compensable injury"); *Miller v. Lake Area Hosp.,* 551 *N.W.*2d 817, 820–21 (S.D.1996) ("The time period for notice or claim does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness and probable compensable character of the injury or disease."); *Hibner v. St. Paul Mercury Ins. Co.,* 619 *S.W.*2d 109, 110 (Tenn.1981) ("It is now settled that the date the employee's disability manifests itself to a person of reasonable diligence, not the date of the accident, triggers the statute of limitations.").

Moreover, a large number of states with statutes that time claims from the "accident" judicially have adopted discovery rules to protect workers with latent accidental injuries. *See American Cyanamid v. Shepherd,* 668 *So.*2d 26, 28 (Ala.Civ.App.1995) (citing

2B A. Larson, *Workmen's Compensation Law* § 78.42(a) (1982)) (reasoning that discovery rule is only "logical and humane solution" for cases involving latent injuries); *Rose v. Cadillac Fairview Shopping Ctr.*, 668 *A.*2d 782, 790 n. 5 (Del.Super.Ct.1995), *aff'd sub nom., Rose v. Sears, Roebuck & Co.*, 676 *A.*2d 906 (Del.Super.Ct.1996) (stating in *dicta* that Delaware's "accident" statute of limitations "does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness, and *probable compensable character* of the injury") (emphasis in original); *Lofgren v. Pieper Farms*, 540 *N.W.*2d 834, 836–37 (Minn. 1995) (finding that claimant, whose eye injury did not manifest itself until after limitations period had closed, consequently was not barred from recovery where his employer provided him with mistaken advice, causing him to delay in filing claim); *Jones v. Thermo King*, 461 *N.W.*2d 915, 917 (Minn.1990) ("[F]or both personal injury and occupational disease, the statute of limitations begins to run when the employee has sufficient information of the nature of the injury or disease, its seriousness, and probable compensability."); *Lorenz v. Sweetheart Cup Co.*, 60 *S.W.*3d 677, 685 (Mo.Ct.App.2001) (holding that claimant's request to amend his claim for workers' compensation benefits, due to aggravation of manic depression, was not barred by statute of limitations when it was made within two years of date upon which medical personnel diagnosed such aggravation); *Cemer v. Huskoma Corp.*, 221 *Neb.* 175, 375 *N.W.*2d 620, 622 (1985) (citing *Maxey v. Fremont Dep't of Utils.*, 220 *Neb.* 627, 371 *N.W.*2d 294 (Neb.1985)) (construing Nebraska's statute of limitations, which is facially "accident" statute, to provide discovery exception when "the injury is deemed to be, at the outset, latent and progressive," thereby precluding accrual of the statute of limitations until such time when "the employee discovers or should have discovered that he has a compensable disability"); *Johansen v. Union Stockyards Co. of Omaha*, 99 *Neb.* 328, 156 *N.W.* 511, 512 (1916) ("[I]t cannot be said that the injury resulted from the accident, within the meaning of the statute, before the time it was discovered that it might become permanent...."); *Mauldin, supra*, 416 *S.E.2d* at 641 (rejecting

"mechanical" application of "accident" statute of limitations in favor of discovery rule for "accident" statute of limitations when claimant could not have known seriousness and work-relatedness of injury until after expiration of limitations period); *see also Garnsey v. Concrete Inc. of Hobbs,* 122 *N.M.* 195, 922 *P.*2d 577, 580 (Ct.App.1996) (rejecting literal approach to workers' compensation statute of limitations running from "accidental injury" as leading to "absurd consequences"); *State v. Huntington–Cleveland Irrigation Co.,* 52 *P.*3d 1257, 1265 n. 4 (Utah 2002) (citing *Salt Lake City v. Industrial Comm'n,* 93 *Utah* 510, 74 *P.*2d 657, 658 (1937)) (reasoning that "unless a statute otherwise provides, generally the plaintiff must have suffered damages before a cause of action accrues for statute of limitations purposes"); *Salt Lake City v. Industrial Comm'n,* 93 *Utah* 510, 74 *P.*2d 657, 658 (1937) ("A mere accident does not impose the duty to pay. Accident plus injury there from does not impose the duty. But accident plus injury which results in disability or loss gives rise to the duty to pay."). *But see DeBusk v. Johns Hopkins Hosp.,* 342 *Md.* 432, 677 *A.*2d 73 (1996) (holding that statute of limitations started to run from date that nurse first hoisted patient to keep him from falling, even though claimant only felt minor strain in neck at that time, continued to work, and did not experience severe pain or discover spur in neck until months after the accident); *Perdue v. Daniel Intern. Inc.,* 59 *N.C.App.* 517, 296 *S.E.*2d 845 (1982) (barring recovery for claimant who filed out of time even though doctor told him he had merely strained back muscle and claimant did not discover he had broken his back until three years after initial fall). We subscribe to the majority holdings, which are reflective of the modern view of workers' compensation law.

## C.

In the face of that authority, the Departments argue that because our Legislature specifically enacted a discovery rule in the occupational disease statute without a concomitant modification of the accident statute, we lack any power to ameliorate the harsh

results of interpreting accident as the equivalent of the traumatic event.

We note, however, that this Court already has stated clearly that the Legislature's enactment of the discovery rule in the occupational disease statute "in no manner suggested any legislative purpose that a contrary and retrogressive approach be deemed embodied" in the accident statute. *Panchak, supra,* 15 *N.J.* at 25, 103 *A.*2d 884. Moreover, we think the history of the Legislature's incorporation of a discovery rule into the occupational disease statute is instructive here. In 1948, the Legislature added a discovery rule, acknowledging that the Act "fail[ed] to recognize the established fact that some occupational diseases have not become manifest until a considerably longer time than one year after cessation of the exposure." Sponsor's Statement to *L.* 1948, c. 468. The Legislature declared that "[t]he essential purpose of this bill is to extend the statutory limitation period in an equitable and reasonable manner and, thereby, to establish in New Jersey a progressive policy in this matter comparable to that in New York, Wisconsin and other States." *Ibid.* Thereafter, when case law resulted in a strict interpretation of the five-year statute of repose and barred latent disease claims, the symptoms of which did not even manifest themselves until more than five years from the exposure (*Kane v. Durotest Corp.,* 37 *N.J.* 552, 182 *A.*2d 559 (1962)), the Legislature eliminated the five-year statute altogether. The sponsor's statement to that bill indicates:

Occupational diseases are often of such an insidious nature that they do not become evident until years after exposure to the cause thereof. This bill memorializes this fact by abrogating the burdensome and arbitrary time restrictions presently in effect within which a claim for compensation must be filed, and which in fact may easily lapse before even the symptoms of the disease are evident.

[Sponsor's Statement to *L.* 1974, c. 65.]

As is evident, the entire focus of the Legislature's enactment of the discovery rule and elimination of the statute of repose was to avoid the fundamental unfairness to workers who suffer latent or insidiously developing diseases and could potentially lose their workers' compensation claims before they even knew they had

been injured. Nothing in that history suggests that the Legislature would not have been concerned equally over the fate of workers who suffer a traumatic event resulting in a delayed onset or insidiously developing disease. Indeed, it seems likely that the Legislature failed to address specifically accident-related latent injuries in the ameliorative scheme it developed for insidious occupational diseases because it was operating under the generally correct impression that the typical industrial accident (traumatic event, plus simultaneous disabling injury) is the sole accident model and that no modification of the accident statute was necessary.

On the contrary, as we have indicated, there is a narrow band of accident cases in which there are latent and insidiously progressive conditions that ordinarily mark an occupational disease. The question presented is how the Legislature would have intended us to calculate the claim provisions of the statute in those circumstances.

As we have observed, in enacting the occupational disease discovery rule, the Legislature clearly addressed insidiously developing diseases and expressed a desire to "abrogate the burdensome and arbitrary time restrictions ... which in fact may easily lapse before even the symptoms of the disease are evident." Sponsor's Statement to *L.* 1974, c. 65. Against that backdrop, it seems evident that if the Legislature had been faced expressly with the narrow class of accident cases involving latency and insidious onset diseases, it would have included them under a discovery-rule umbrella.

In reaching that conclusion, we have performed a classic judicial function—determining the essential purpose and design of a statute in order to effectuate the goals underlying it. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000). In so doing, we have considered the fundamental goal of the Act and interpreted it in a manner consonant with the probable intent of the draftsman had he anticipated the matter at hand. *New Jersey Democratic Party, Inc. v. Samson,* 175 *N.J.* 178, 193–94, 814 *A.*2d

1028 (2002), *certif. denied Forrester v. New Jersey Democratic Party, Inc.,* —— U.S. ——, 123 *S.Ct.* 673, 154 *L.Ed.*2d 582 (2002); *Hubbard v. Reed,* 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001); *Township of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999); *AMN, Inc. v. Township of S. Brunswick Rent Leveling Bd.,* 93 *N.J.* 518, 524–25, 461 *A.*2d 1138 (1983).

That is not to suggest a wholesale importation of the discovery rule that is a part of the occupational disease statute into all accidental injury cases. Notice and claim limitations in classic industrial accidents involving simultaneous traumatic event and injury will continue to be calculated from the date of the traumatic event. It is only in the narrow band of accident cases involving latency and insidious onset diseases that we think the Legislature would have intended the kind of leeway it developed to avoid a legitimately injured worker losing an occupational claim to be equally applicable to latent injury accidents.

Moreover, it should be noted that applying a discovery-type rule to that narrow class of accident cases will not result in the obliteration of the distinction between accidental injury and occupational disease for notice and filing purposes. It remains the fact that the accident calculation begins when the worker knows or should know he has incurred any compensable injury (for example, medical bills, temporary disability, or permanent disability). On the contrary, the occupational disease clock does not begin to run until the worker knows the true nature and seriousness of the disability. *Earl, supra,* 158 *N.J.* at 161, 728 *A.*2d 820. That distinction gives the worker more latitude in notifying the employer and filing a claim based on occupational disease, presumably because there the employer could have anticipated such a disease as a natural hazard of the job. Less latitude is afforded the worker who is injured in an unexpected accident. Once he knows he has sustained *any* compensable injury, he must act.

Finally, we note that our analysis of the timeliness issue will be critical not only to the claimants here, but also to the many workers in ordinary occupations who develop insidious onset dis-

eases from a trauma and cannot invoke the occupational disease statute. Without it, those workers, who the Legislature clearly intended to be the beneficiaries of the Workers' Compensation Act, would otherwise lose their claims two years from the traumatic event even if, at that point, they were totally unaware that they had sustained an injury. We therefore hold that an accidental injury for reporting and filing purposes has not occurred until the point at which a reasonable person would know he had sustained a compensable injury.

## VIII

That brings us to the cases on appeal. Because they were dismissed before trial, the entire record consists of the claimants' filings. At this posture of the case, we assume the allegations in those filings are provable.[5] In essence, the claimants assert exposure to a horrific traumatic event—Stango directly and Brunell indirectly—and both claim that exposure resulted in the subsequent development of PTSD. Brunell's expert specifically denominated her PTSD as of the delayed onset type. Stango's expert declared his PTSD to be chronic but Stango himself identified the precipitating balloon event as a point at which the symptoms became recognizable. Both contend that their PTSD was caused in material degree by their employment; that exposure to horrific events is a particular hazard of police work to which the class made up of police employees is subject; and that PTSD is not unexpected in police employment.

We think the claimants should have an opportunity to present their proofs (lay and expert) to the court which shall determine, without giving undue weight to any of the indicators, whether the facts established fit best within the occupational

---

[5] The Departments have not challenged the claimants' satisfaction of the "arising out of" and "in the course of" standards in the statutes. *N.J.S.A.* 34:15–7; *N.J.S.A.* 34:15–31. They only contest the characterization and timeliness of the claims.

disease model, the accidental injury model, or neither. The fact that the fit is not a perfect one will not preclude recovery. *Fiore, supra,* 140 *N.J.* at 462, 659 *A.*2d 436. The court will have to decide, based on expert and lay testimony, whether each of the claimants "witnessed" an extreme traumatic event within the contemplation of the DSM–IV definition of PTSD; if so, whether they, in fact, developed PTSD from the events they have pinpointed; and if so, whether the events were expected or unexpected as an institutional matter (that is, whether PTSD is a natural hazard of police work, and whether police workers, as a class, are exposed to that hazard). Depending on the court's assessment of the proofs, the claims could be characterized as accidental injury or occupational disease.

We have dealt with the cases together because of the similarity of some of the legal issues, but we note that the underlying facts in the cases are distinct. Stango's exposure to the traumatic event was direct and took place while he was responding to the scene of a domestic dispute. He personally witnessed the bloody death of his partner. On the contrary, Brunell's claim came about indirectly through her civilian dispatching job, which did not place her at the scene of Officer Miglio's death. Accordingly, it is possible, depending on the facts adduced at trial, for the claimants to qualify under different sections of the statute, or for one to qualify and not the other. For that reason, the cases should be separately tried.

Because the Division of Workers' Compensation in this case declined to consider the claimants' occupational disease claims, the timeliness of those claims was never addressed. Therefore if on remand the court concludes that one or more of the claims meet the requirements of the occupational disease statute, timeliness remains to be decided. The court will have to determine when the claimants knew the nature, extent, and seriousness of their disabilities and its relation to their employment. *N.J.S.A.* 34:15–34; *Earl, supra,* 158 *N.J.* at 161, 728 *A.*2d 820. It is from that point

that the notice and claim provisions relevant to occupational disease will begin to run.

Regarding the timeliness of claimants' accident claims, the court below has already ruled, contrary to our decision here, that an accident claim must be filed within two years' of the traumatic event. That certainly would be a relevant *ratio decedendi* where a worker experienced an unexpected traumatic event and was injured simultaneously. In that event, all the elements of accident would have occurred at the same time, and the statutes governing notice and claim periods would have begun to run from that point. As we have indicated, however, where, as here, the claimants suffered a traumatic event with a delayed onset disease, a different analysis, incorporating knowledge on the worker's part, is required.

If on remand the court characterizes either of the claims as accidental, it will be necessary to assess its timeliness in light of the standards we have established. Obviously, where insidious disease processes are involved, fact-intensive determinations regarding timeliness will have to be made. For example, where, as here, both claimants acknowledge early signs of anxiety that they considered a normal aftermath of any traumatic event, it will fall to the Division of Workers' Compensation to determine the point at which those signs would have alerted a reasonable person that he or she had sustained a compensable injury. It is from that point that the statute will run.

## IX

We reverse the judgment of the Appellate Division and remand the cases to the Division of Workers' Compensation for consideration of the substance and timeliness of the claimants' contentions under the standards to which we have adverted. Our disposition should not be taken as a commentary on the quality, sufficiency, or timeliness of their claims, but only as a ruling that they are not prohibited from raising them.

*For reversing and remanding—* Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.